# NYQUIST, COMMISSIONER OF EDUCATION OF NEW YORK, ET AL. *v.* MAUCLET ET AL.

No. 76-208.   Argued March 22, 1977—Decided June 13, 1977

BLACKMUN, J., delivered the opinion of the Court, in which BRENNAN, WHITE, MARSHALL, and STEVENS, JJ., joined. BURGER, C. J., filed a dissenting opinion, *post*, p. 12. POWELL, J., filed a dissenting opinion, in which BURGER, C. J., and STEWART, J., joined, *post*, p. 15. REHNQUIST, J., filed a dissenting opinion, in which BURGER, C. J., joined, *post*, p. 17.

*Judith A. Gordon,* Assistant Attorney General of New York, argued the cause for appellants. With her on the briefs were *Louis J. Lefkowitz,* Attorney General, and *Samuel A. Hirshowitz,* First Assistant Attorney General.

*Michael Davidson* argued the cause for appellee Mauclet. With him on the brief was *Kevin Kennedy. Gary J. Greenberg* argued the cause and filed a brief for appellee Rabinovitch.

MR. JUSTICE BLACKMUN delivered the opinion of the Court.

New York, by statute, bars certain *resident* aliens from state financial assistance for higher education. N. Y. Educ. Law § 661 (3) (McKinney Supp. 1976). This litigation presents a constitutional challenge to that statute.

I

New York provides assistance, primarily in three forms, to students pursuing higher education. The first type is the Regents college scholarship. These are awarded to high school graduates on the basis of performance in a competitive examination. §§ 605 (1) and 670. Currently, in the usual case, a recipient is entitled to $250 annually for four years of study without regard to need. §§ 670 (2) and (3)(b).[1] The

---

[1] There also are other special competitive awards: Regents professional education in nursing scholarships, N. Y. Educ. Law §§ 605 (2) and 671

second and chief form of aid is the tuition assistance award. These are noncompetitive; they are available to both graduate and undergraduate students "enrolled in approved programs and who demonstrate the ability to complete such courses." §§ 604 (1) and 667 (1). The amount of the award depends on both tuition and income. The ceiling on assistance was $600, although it has been increased for undergraduates to $1,500. §§ 667 (3) and (4). The third form of assistance is the student loan. §§ 680–684. The loan is guaranteed by the State; a borrower meeting certain income restrictions is entitled to favorable interest rates and generally to an interest-free grace period of at least nine months after he completes or terminates his course of study. §§ 680, 682 (2) and (3).[2]

There are several general restrictions on eligibility for participation in any of these programs. § 661. For example, there is a modest durational residency requirement. § 661 (5).[3] The instant dispute, however, concerns only § 661 (3). That subsection provides:

"Citizenship. An applicant (a) must be a citizen of the United States, or (b) must have made application

(McKinney Supp. 1976); Regents professional education in medicine or dentistry scholarships, §§ 605 (3) and 672; Regents physician shortage scholarships, §§ 605 (4) and 673; Regents war veteran scholarships, §§ 605 (5) and 674; and Regents Cornell University scholarships, § 605 (6).

[2] The loan program is largely subsidized by the Federal Government. See 20 U. S. C. §§ 1071 to 1087–2 (1970 ed. and Supp. V). (In fiscal 1976 the federal expenditure for New York's loan program was $67,208,000 and the state contribution was $9,466,000. Brief for Appellants 8 n. * and 17 n. *.) Although it appears that federal administrators have not lodged objections to the State's practice of disqualifying certain resident aliens, see App. 82, the federal standards would make eligible for assistance an alien student who "is in the United States for other than a temporary purpose and intends to become a permanent resident thereof." 45 CFR § 177.2 (a) (1976).

[3] This requirement is not the subject of challenge here. See *Vlandis* v. *Kline,* 412 U. S. 441 (1973); *Starns* v. *Malkerson,* 401 U. S. 985 (1971), aff'g 326 F. Supp. 234 (Minn. 1970).

to become a citizen, or (c) if not qualified for citizenship, must submit a statement affirming intent to apply for United States citizenship as soon as he has the qualifications, and must apply as soon as eligible for citizenship, or (d) must be an individual of a class of refugees paroled by the attorney general of the United States under his parole authority pertaining to the admission of aliens to the United States." [4]

The statute obviously serves to bar from the assistance programs the participation of all aliens who do not satisfy its terms. Since many aliens, such as those here on student visas, may be precluded by federal law from establishing a permanent residence in this country, see, e. g., 8 U. S. C. § 1101 (a)(15)(F)(i); 22 CFR § 41.45 (1976), the bar of § 661 (3) is of practical significance only to resident aliens. The Court has observed of this affected group: "Resident aliens, like citizens, pay taxes, support the economy, serve in the Armed Forces, and contribute in myriad other ways to our society." In re Griffiths, 413 U. S. 717, 722 (1973).

## II

Appellee Jean-Marie Mauclet is a citizen of France and has lived in New York since April 1969. He has been a permanent resident of the United States since November of that year. He is married to a United States citizen and has a child by that marriage. The child is also a United States citizen. App. 49. Mauclet by affidavit stated: "Although I am presently qualified to apply for citizenship and intend to reside

---

[4] Section 661 (3) replaced former § 602 (2) of the State's Education Law, in effect at the times appellees' complaints were filed. 1974 N. Y. Laws, c. 942. Clause (d) was added after the commencement of the suits. 1975 N. Y. Laws, c. 663, § 1. Since clause (d) serves to make a class of aliens eligible for aid without regard to citizenship or intent to apply for citizenship, its inclusion serves to undermine the State's arguments as to the purposes served by the first three clauses. See n. 13, infra.

permanently in the United States, I do not wish to relinquish my French citizenship at this time." [5]  *Id.,* at 50.  He applied for a tuition assistance award to aid in meeting the expenses of his graduate studies at the State University of New York at Buffalo.  Because of his refusal to apply for United States citizenship, his application was not processed.  *Id.,* at 49–50.

Appellee Alan Rabinovitch is a citizen of Canada.  He was admitted to this country in 1964 at the age of nine as a permanent resident alien.  He is unmarried and, since his admission, has lived in New York with his parents and a younger sister, all of whom are Canadian citizens.  He registered with Selective Service on his 18th birthday.  He graduated in 1973 from the New York public school system.  *Id.,* at 68, 71.  As a result of a commendable performance on the competitive Regents Qualifying Examinations, Rabinovitch was informed that he was qualified for, and entitled to, a Regents college scholarship and tuition assistance.  He later was advised, however, that the offer of the scholarship was withdrawn since he intended to retain his Canadian citizenship.  *Id.,* at 69, 25.  Rabinovitch entered Brooklyn College without financial aid from the State.  He states that he "does not intend to become a naturalized American, but . . . does intend to continue to reside in New York."  *Id.,* at 65.

Mauclet and Rabinovitch each brought suit in United States District Court (Mauclet in the Western District of New York and Rabinovitch in the Eastern District), alleging that the citizenship bar of § 661 (3) was unconstitutional.  The same three-judge court was convened for each of the cases.  Subsequently, it was ordered that the cases be heard together.  App. 45.  After cross motions for summary judgment, the District Court in a unanimous opinion ruled in appellees' favor.  It held that § 661 (3) violated the Equal Protection Clause of the Fourteenth Amendment in that the citizenship

---

[5] In order to become a United States citizen, Mauclet would be required to renounce his French citizenship.  8 U. S. C. § 1448 (a).

6

requirement served to discriminate unconstitutionally against resident aliens.[6]  406 F. Supp. 1233 (WDNY and EDNY 1976).  Its enforcement was enjoined in separate judgments. App. 103, 106.

Appellants—the various individuals and corporate entities responsible for administering the State's educational assistance programs—challenge this determination.[7]  We noted probable jurisdiction.  429 U. S. 917 (1976).

---

[6] Other courts also have held that discrimination against resident aliens in the distribution of educational assistance is impermissible.  See, e. g., Chapman v. Gerard, 456 F. 2d 577 (CA3 1972); Jagnandan v. Giles, 379 F. Supp. 1178 (ND Miss. 1974), appealed on damages and aff'd, 538 F. 2d 1166 (CA5 1976), cert. pending, No. 76–832.

[7] Appellants also argue that the District Court should not have reached the question of the applicability of § 661 (3) to the loan program because appellee Rabinovitch, who alone challenged this aspect of the assistance program, had not been denied a loan.  Hence, appellants assert, he lacks standing.  Early in the litigation, however, Rabinovitch submitted an unrebutted affidavit to the effect that he believed that he "may require student loans to help cover the cost of" his education and that he was "barred from receiving a student loan simply because of [his] status as an alien."  App. 71.  Indeed, appellants conceded in the District Court that any application from Rabinovitch for a loan would be refused because of § 661 (3).  406 F. Supp., at 1235.  It is clear, therefore, that Art. III adverseness existed between the parties and that the dispute is a concrete one.  The only obstacle to standing, under the circumstances, would arise from prudential considerations.  And we see no reason to postpone resolution of the dispute.  Rabinovitch has been denied other forms of aid and little is to be served by requiring him now to go through the formality of submitting an application for a loan, in light of the certainty of its denial. See Arlington Heights v. Metropolitan Housing Dev. Corp., 429 U. S. 252, 264 (1977).  Until oral argument, appellants suggested no reason why the loan program should differ from the other forms of assistance.  Tr. of Oral Arg. 7.  In the absence of a more timely suggestion supporting a distinction among the forms of aid, we think that nothing is to be gained by adjudicating the validity of § 661 (3) with regard to only two of the three primary assistance programs.  After all, the single statutory proscription applies with equal force to all the programs.

## III

The Court has ruled that classifications by a State that are based on alienage are "inherently suspect and subject to close judicial scrutiny." *Graham* v. *Richardson,* 403 U. S. 365, 372 (1971). See *Examining Board* v. *Flores de Otero,* 426 U. S. 572, 601–602 (1976); *In re Griffiths,* 413 U. S., at 721; *Sugarman* v. *Dougall,* 413 U. S. 634, 642 (1973). In undertaking this scrutiny, "the governmental interest claimed to justify the discrimination is to be carefully examined in order to determine whether that interest is legitimate and substantial, and inquiry must be made whether the means adopted to achieve the goal are necessary and precisely drawn." *Examining Board* v. *Flores de Otero,* 426 U. S., at 605. See *In re Griffiths,* 413 U. S., at 721–722. Alienage classifications by a State that do not withstand this stringent examination cannot stand.[8]

Appellants claim that § 661 (3) should not be subjected to such strict scrutiny because it does not impose a classifica-

---

[8] In *Mathews* v. *Diaz,* 426 U. S. 67 (1976), the Court applied relaxed scrutiny in upholding the validity of a federal statute that conditioned an alien's eligibility for participation in a federal medical insurance program on the satisfaction of a durational residency requirement, but imposed no similar burden on citizens. The appellants can draw no solace from the case, however, because the Court was at pains to emphasize that Congress, as an aspect of its broad power over immigration and naturalization, enjoys rights to distinguish among aliens that are not shared by the States. *Id.,* at 84–87. See *Hampton* v. *Mow Sun Wong,* 426 U. S. 88, 100–101 (1976); *De Canas* v. *Bica,* 424 U. S. 351, 358 n. 6 (1976).

It is perhaps worthy of note that the Medicare program under consideration in *Diaz* granted a permanent resident alien eligibility when he had resided in the United States for five years. Five years' residence is also the generally required period under federal law before an alien *may* seek to be naturalized. 8 U. S. C. § 1427 (a). Yet, ironically, this is precisely the point at which, in New York, a resident *must* petition for naturalization or, irrespective of declared intent, lose his eligibility for higher education assistance.

tion based on alienage.[9]  Aliens who have applied for citizenship, or, if not qualified for it, who have filed a statement of intent to apply as soon as they are eligible, are allowed to participate in the assistance programs.  Hence, it is said, the statute distinguishes "only within the 'heterogeneous' class of aliens" and "does not distinguish between citizens and aliens *vel non.*"  Brief for Appellants 20.[10]  Only statutory classifications of the latter type, appellants assert, warrant strict scrutiny.

*Graham* v. *Richardson, supra,* undermines appellants' position.  In that case, the Court considered an Arizona statute that imposed a durational residency requirement for welfare benefits on aliens but not on citizens.  Like the New York statute challenged here, the Arizona statute served to discriminate only within the class of aliens: Aliens who met the durational residency requirement were entitled to welfare

---

[9] Appellants also seem to assert that strict scrutiny should not be applied because aid to education does not deny an alien "access to the necessities of life."  Brief for Appellants 21.  They are joined in this view by THE CHIEF JUSTICE in dissent.  Suffice it to say, the statutory statement of purpose for the aid programs reflects the State's contrary position:

"In a world of unmatched scientific progress and technological advance, as well as of unparalleled danger to human freedom, learning has never been more crucial to man's safety, progress and individual fulfillment. In the state and nation higher education no longer is a luxury; it is a necessity for strength, fulfillment and survival."  1961 N. Y. Laws, c. 389, § 1 (a).

And, in any event, the Court noted in *Graham* v. *Richardson,* 403 U. S. 365, 376 (1971), that classifications based on alienage "are inherently suspect and are therefore subject to strict scrutiny whether or not a fundamental right is impaired."

[10] The District Court dealt abruptly with appellants' contention:

"This argument defies logic.  Those aliens who apply, or agree to apply when eligible, for citizenship are relinquishing their alien status.  Because some aliens agree under the statute's coercion to change their status does not alter the fact that the classification is based solely on alienage."  406 F. Supp., at 1235.

benefits. The Court nonetheless subjected the statute to strict scrutiny and held it unconstitutional. The important points are that § 661 (3) is directed at aliens and that only aliens are harmed by it. The fact that the statute is not an absolute bar does not mean that it does not discriminate against the class.[11] Cf. *Mathews* v. *Lucas,* 427 U. S. 495, 504-505, n. 11 (1976); [12] *Weber* v. *Aetna Casualty & Surety Co.,* 406 U. S. 164, 169, 172 (1972).

Appellants also assert that there are adequate justifications for § 661 (3). First, the section is said to offer an incentive for aliens to become naturalized. Second, the restriction on

---

[11] Our Brother REHNQUIST argues in dissent that strict scrutiny is inappropriate because under § 661 (3) a resident alien can voluntarily withdraw from disfavored status. But this aspect of the statute hardly distinguishes our past decisions. By the logic of the dissenting opinion, the suspect class for alienage would be defined to include at most only those who have resided in this country for less than five years, since after that time, if not before, resident aliens are generally eligible to become citizens. 8 U. S. C. § 1427 (a). The Court has never suggested, however, that the suspect class is to be defined so narrowly. In fact, the element of voluntariness in a resident alien's retention of alien status is a recognized element in several of the Court's decisions. For example, the Court acknowledged that *In re Griffiths,* 413 U. S. 717 (1973), involved an appellant who was eligible for citizenship, but who had not filed a declaration of intention to become a citizen, and had "no present intention of doing so." *Id.,* 718 n. 1. And, insofar as the record revealed, nothing precluded the appellees in *Sugarman* v. *Dougall,* 413 U. S. 634 (1973), from applying for citizenship. *Id.,* at 650 (REHNQUIST, J., dissenting). MR. JUSTICE REHNQUIST argued in dissent there, just as he does here today, that strict scrutiny was inappropriate in those cases because there was nothing to indicate that the aliens' status "cannot be changed by their affirmative acts." *Id.,* at 657. Nonetheless, the Court applied strict scrutiny in the cases. We see no reason to depart from them now.

[12] The footnote reads in part:

"That the statutory classifications challenged here discriminate among illegitimate children does not mean, of course, that they are not also properly described as discriminating between legitimate and illegitimate children."

assistance to only those who are or will become eligible to vote is tailored to the purpose of the assistance program, namely, the enhancement of the educational level of the electorate. Brief for Appellants 22–25. Both justifications are claimed to be related to New York's interest in the preservation of its "political community." See *Sugarman* v. *Dougall,* 413 U. S., at 642–643, 647–649; *Dunn* v. *Blumstein,* 405 U. S. 330, 344 (1972).

The first purpose offered by the appellants, directed to what they describe as some "degree of national affinity," Brief for Appellants 18, however, is not a permissible one for a State. Control over immigration and naturalization is entrusted exclusively to the Federal Government, and a State has no power to interfere. U. S. Const., Art I, § 8, cl. 4. See *Mathews* v. *Diaz,* 426 U. S. 67, 84–85 (1976); *Graham* v. *Richardson,* 403 U. S., at 376–380; *Takahashi* v. *Fish & Game Comm'n,* 334 U. S. 410, 419 (1948). But even if we accept, *arguendo,* the validity of the proffered justifications, we find them inadequate to support the ban.[13]

---

[13] In support of the justifications offered for § 661 (3), appellants refer to a statement of purpose in legislation adopted in 1961 that substantially amended the State's aid programs. 1961 N. Y. Laws, c. 389, § 1. But the statement speaks only in general terms of encouraging education so as "to provide the broad range of leadership, inventive genius, and source of economic and cultural growth for oncoming generations," § 1 (a), and of developing fully a "reservoir of talent and future leadership," § 1 (c)— purposes that would be served by extending aid to resident aliens as well as to citizens—and hardly supports appellants in clear and unambiguous terms. Moreover, the statutory discrimination against aliens with regard to certain Regents scholarships dates from long before. 1920 N. Y. Laws, c. 502, § 1. And the very 1961 legislation on which appellants rely abolished the statutory disqualification of aliens in favor of an administrative rule. 1961 N. Y. Laws, c. 391, §§ 2 and 18. See also §§ 7, 14, and 19. In fact, it appears that the state administrators of the aid programs did not find the purposes in the 1961 legislation that appellants urge, since between 1961 and 1969, when the precursor of § 661 (3) was

In *Sugarman* v. *Dougall,* 413 U. S., at 642, the Court rec-
ognized that the State's interest "in establishing its own
form of government, and in limiting participation in that
government to those who are within 'the basic conception of a
political community'" might justify some consideration of
alienage.   But as *Sugarman* makes quite clear, the Court had
in mind a State's historical and constitutional powers to define
the qualifications of voters,[14] or of "elective or important
nonelective" officials "who participate directly in the formula-
tion, execution, or review of broad public policy."   *Id.,* at 647.
See *id.,* at 648.   *In re Griffiths,* decided the same day, reflects
the narrowness of the exception.   In that case, despite a
recognition of the vital public and political role of attorneys,
the Court found invalid a state-court rule limiting the practice
of law to citizens.   413 U. S., at 729.

Certainly, the justifications for § 661 (3) offered by appel-
lants sweep far beyond the confines of the exception defined in
*Sugarman.*   If the encouragement of naturalization through
these programs were seen as adequate, then every discrimina-
tion against aliens could be similarly justified.   The exception
would swallow the rule.   *Sugarman* clearly does not tolerate
that result.   Nor does the claimed interest in educating the
electorate provide a justification; although such education is
a laudable objective, it hardly would be frustrated by includ-
ing resident aliens, as well as citizens, in the State's assistance
programs.[15]

---

adopted, resident aliens were allowed to receive tuition assistance awards.
Brief for Appellants 15.

[14] See also *Perkins* v. *Smith,* 370 F. Supp. 134 (Md. 1974), summarily
aff'd, 426 U. S. 913 (1976).

[15] Although the record does not reveal the number of aliens who are
disqualified by § 661 (3), there is a suggestion that the number may be
exceedingly small.   See Brief for Appellee Mauclet 9 n. 4.   Indeed, when
asked about the cost of including aliens, appellants conceded at oral
argument that "we may not be speaking about very much."   Tr. of Oral

Resident aliens are obligated to pay their full share of the taxes that support the assistance programs. There thus is no real unfairness in allowing resident aliens an equal right to participate in programs to which they contribute on an equal basis. And although an alien may be barred from full involvement in the political arena, he may play a role—perhaps even a leadership role—in other areas of import to the community. The State surely is not harmed by providing resident aliens the same educational opportunity it offers to others.

Since we hold that the challenged statute violates the Fourteenth Amendment's equal protection guarantee, we need not reach appellees' claim that it also intrudes upon Congress' comprehensive authority over immigration and naturalization. See *Graham* v. *Richardson,* 403 U. S., at 378; *Truax* v. *Raich,* 239 U. S. 33, 42 (1915).

The judgments of the District Court are affirmed.

*It is so ordered.*

MR. CHIEF JUSTICE BURGER, dissenting.

I join MR. JUSTICE REHNQUIST's and MR. JUSTICE POWELL's dissenting opinions, but I add this comment to point out yet other significant differences between this case and our prior cases involving alienage-based classifications.

With one exception, the prior cases upon which the Court purports to rely involved statutes which prohibited aliens from engaging in certain occupations or professions, thereby impairing their ability to earn a livelihood. See, *e. g., Examining Board* v. *Flores de Otero,* 426 U. S. 572 (1976) (Puerto

---

Arg. 6. Thus, it appears that the inclusion of resident aliens in the assistance programs will have an insubstantial impact on the cost of the programs. And, in any event, the suggestion that the State can favor citizens over aliens in the distribution of benefits was largely rejected in *Graham* v. *Richardson, supra.*

Rico statute permitted only United States citizens to practice as private civil engineers); *In re Griffiths,* 413 U. S. 717 (1973) (membership in state bar limited to citizens); *Sugarman* v. *Dougall,* 413 U. S. 634 (1973) (participation in State's competitive civil service limited to citizens); *Takahashi* v. *Fish & Game Comm'n,* 334 U. S. 410 (1948) (state statute denied fishing license to persons "ineligible to citizenship"); *Truax* v. *Raich,* 239 U. S. 33 (1915) (state constitution required employers to hire "not less than eighty (80) per cent qualified electors or native-born citizens of the United States"); *Yick Wo* v. *Hopkins,* 118 U. S. 356 (1886) (city ordinance discriminatorily enforced against aliens so as to prevent Chinese subjects, but not United States citizens, from operating laundries within the city). The only other case striking down a classification on the basis of alienage, *Graham* v. *Richardson,* 403 U. S. 365 (1971), involved the denial of *welfare* benefits essential to sustain life for aliens, while needy citizens were given such benefits. The Court has noted elsewhere the crucial role which such benefits play in providing the poor with "means to obtain essential food, clothing, housing, and medical care." *Goldberg* v. *Kelly,* 397 U. S. 254, 264 (1970) (footnote omitted).

In this case the State is not seeking to deprive aliens of the essential means of economic survival. Rather, pursuant to its broad power to regulate its education system, the State has chosen to provide some types of individuals—those it considers most likely to provide a long-range return to the local and national community—certain added benefits to facilitate participation in its system of higher education. The State is certainly not preventing aliens from obtaining an education, and indeed it is clear that appellees may attend New York colleges and universities on an equal footing with citizens. However, beyond that, the State has provided certain economic incentives to its own citizens to induce them to pursue higher studies, which in the long run will be a benefit to the

State. The State has not deemed such incentives as necessary or proper as to those aliens who are unwilling to declare their commitment to the community in which they reside by declaring their intent to acquire citizenship. Such simple declaration is all that the statute requires.

In my view, the Constitution of the United States allows States broad latitude in carrying out such programs. Where a *fundamental* personal interest is not at stake—and higher education is hardly that—the State must be free to exercise its largesse in any reasonable manner. New York, like most other States, does not have unlimited funds to provide its residents with higher education services; it is equally clear that the State has every interest in assuring that those to whom it gives special help in obtaining an education have or declare some attachment indicating their intent to remain within the State to practice their special skills. It has no interest in providing these benefits to transients from another country who are not willing to become citizens. The line drawn by the State is not a perfect one—and few lines can be—but it does provide a rational means to further the State's legitimate objectives. Resident individuals who are citizens, or who declare themselves committed to the idea of becoming American citizens, are more likely to remain in the State of New York after their graduation than are aliens whose ties to their country of origin are so strong that they decline to sever them in order to secure these valuable benefits.

I therefore conclude that the State of New York has not acted impermissibly in refusing to dispense its limited tax revenues to give assistance to aliens who by clear implication reject the opportunity to become citizens of the United States. Beyond the specific case, I am concerned that we not obliterate all the distinctions between citizens and aliens, and thus depreciate the historic values of citizenship.

If a State desires—and has the means—nothing in the United States Constitution prevents it from voluntarily giving

scholarships to aliens, even to those who reject United States citizenships. But nothing heretofore found in the Constitution *compels* a State to apply its finite resources to higher education of aliens who have demonstrated no permanent attachment to the United States and who refuse to apply for citizenship.

MR. JUSTICE POWELL, with whom THE CHIEF JUSTICE and MR. JUSTICE STEWART join, dissenting.

I am persuaded, for the reasons set forth in MR. JUSTICE REHNQUIST's dissent, that New York's scheme of financial assistance to higher education does not discriminate against a suspect class. The line New York has drawn in this case is not between aliens and citizens, but between aliens who prefer to retain foreign citizenship and all others.

> "The system of alleged discrimination and the class it defines have none of the traditional indicia of suspectness: the class is not saddled with such disabilities, or subjected to such a history of purposeful unequal treatment, or relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process." *San Antonio School Dist.* v. *Rodriguez,* 411 U. S. 1, 28 (1973).

Our prior cases dealing with discrimination against all aliens as a class, *In re Griffiths,* 413 U. S. 717 (1973); *Sugarman* v. *Dougall,* 413 U. S. 634 (1973), and against subclasses of aliens without regard to ability or willingness to acquire citizenship, *Graham* v. *Richardson,* 403 U. S. 365 (1971), do not justify the application of strict judicial scrutiny to the legislative scheme before us today.*

---

*The Court's reliance on the personal status of the appellant in *In re Griffiths* is misplaced. Our observation that Griffiths herself was eligible for citizenship but did not intend to apply, 413 U. S., at 718 n. 1, was hardly more than a factual "aside." The challenge in that case was to

I also agree with MR. JUSTICE REHNQUIST that the line New York has drawn in extending scholarship assistance in higher education is a rational one. I see no basis for the Court's statement that offering incentives to resident alien scholars to become naturalized "is not a permissible [purpose] for a State." *Ante,* at 10. In my view, the States have a substantial interest in encouraging allegiance to the United States on the part of all persons, including resident aliens, who have come to live within their borders. As the New York Legislature declared in enacting a predecessor to the present financial assistance scheme:

> "The future progress of the state and nation and the general welfare of the people depend upon the individual development of the maximum number of citizens to provide the broad range of leadership, inventive genius, and source of economic and cultural growth for oncoming generations." 1961 N. Y. Laws, c. 389, § 1 (a).

As long as its program neither discriminates "on the basis of alienage," *Graham* v. *Richardson, supra,* at 372, nor conflicts with federal immigration and naturalization policy, it is my view that New York legitimately may reserve its scholarship assistance to citizens, and to those resident aliens who

---

a Connecticut Rule of Court that flatly required an applicant for admission to the bar to be a citizen of the United States. Neither eligibility for naturalization nor intent to apply was relevant under the Connecticut scheme. There was no question that Griffiths had standing to challenge a classification against all aliens, just as Mauclet and Rabinovitch unquestionably have standing to challenge the classification before us today. Yet because the scheme in *In re Griffiths* "totally exclud[ed] aliens from the practice of law," *id.,* at 719, we had no occasion in that case to consider whether a more narrowly tailored rule would be permissible. Had we done so, we would have confronted the additional question, not presented here, whether the exclusion improperly burdened the right to follow a chosen occupation. Cf. *Takahashi* v. *Fish & Game Comm'n,* 334 U. S. 410 (1948); *Truax* v. *Raich,* 239 U. S. 33 (1915).

declare their intention to become citizens, of both the Nation and the State.

MR. JUSTICE REHNQUIST, with whom THE CHIEF JUSTICE joins, dissenting.

I am troubled by the somewhat mechanical application of the Court's equal protection jurisprudence to this case. I think one can accept the premise of *Graham* v. *Richardson,* 403 U. S. 365 (1971); *In re Griffiths,* 413 U. S. 717 (1973); and *Sugarman* v. *Dougall,* 413 U. S. 634 (1973), and therefore agree with the Court that classifications based on alienage are inherently suspect, but nonetheless feel that this case is wrongly decided. In those cases, the reason postulated for the elevation of alienage classifications to strict scrutiny was directly related to the express exclusion of aliens found in the State's classification. Here, however, we have a significantly different case. The State's classification trenches not at all upon the sole reason underlying the strict scrutiny afforded alienage classifications by this Court.

*Graham* v. *Richardson* is, of course, the starting point of analysis, as it was the first case to explicitly conclude that alienage classifications, like those based on race or nationality, would be subject to strict scrutiny when challenged under the Equal Protection Clause of the Fourteenth Amendment. *Graham* reasoned, 403 U. S., at 372:

> "Aliens as a class are a prime example of a 'discrete and insular' minority (see *United States* v. *Carolene Products Co.,* 304 U. S. 144, 152–153, n. 4 (1938)) for whom such heightened judicial solicitude is appropriate."

It is clear, therefore, that the reason alienage classifications receive heightened judicial scrutiny is because aliens, *qua* aliens, are a "discrete and insular" minority. See also *Sugarman* v. *Dougall, supra,* at 642. Presumptively, such a minority group, like blacks or Orientals, is one identifiable by

18

a status over which the members are powerless. Cf. *Jimenez* v. *Weinberger*, 417 U. S. 628, 631 (1974). And it is no doubt true that all aliens are, at some time, members of a discrete and insular minority in that they are identified by a status which they are powerless to change until eligible to become citizens of this country. Since, as the Court notes, federal law generally requires five years' residence by aliens lawfully admitted for permanent residence as a prerequisite to the seeking of naturalization, 8 U. S. C. § 1427 (a), aliens residing in this country necessarily are subject to a period of time during which they *must* bear this status of an "alien."[1] If a classification, therefore, places aliens in one category, and citizens in another, then, thereafter, every entering resident alien must pass through a period of time in this country during which he falls into the one category and

---

[1] Title 8 U. S. C. § 1427 (a) allows application for naturalization upon the following conditions:

"No person, except as otherwise provided in this subchapter, shall be naturalized unless such petitioner, (1) immediately preceding the date of filing his petition for naturalization has resided continuously, after being lawfully admitted for permanent residence, within the United States for at least five years and during the five years immediately preceding the date of filing his petition has been physically present therein for periods totaling at least half of that time, and who has resided within the State in which the petitioner filed the petition for at least six months, (2) has resided continuously within the United States from the date of the petition up to the time of admission to citizenship, and (3) during all the period referred to in this subsection has been and still is a person of good moral character, attached to the principles of the Constitution of the United States, and well disposed to the good order and happiness of the United States."

Section 1430 (a) establishes a three-year residency requirement for aliens whose spouse is a citizen of the United States. See also 8 U. S. C. § 1434. Sections 1430 (b), (c), and (d) establish special categories where no prior residence in this country is required. They constitute *de minimis* exceptions, and may be properly ignored in considering alienage classifications.

not the other. Nothing except time can remove him from his identified status as an "alien" and from whatever associated disabilities the statute might place on one occupying that status. In this sense, it is possible to view aliens as a discrete and insular minority, since they are categorized by a factor beyond their control.

The prior alienage cases from this Court, utilizing strict scrutiny to strike down state statutes, all dealt with statutes where the line drawn necessarily suffered that infirmity; in all of those cases, the line drawn necessarily left incoming resident aliens afflicted with the disability for some period of time. Nothing except the passage of time could remove the alien from the classification and the disability. The statutes, therefore, involved the precise infirmity which led this Court to accord aliens "suspect classification" treatment: The line drawn by the legislature was drawn on the basis of a status, albeit temporary, that the included members were powerless to change.[2]

While the majority seems to view *Graham* v. *Richardson* as somehow different, *ante,* at 8–9, it is clear that the statute involved in that case suffered from the same weakness. By making aliens, but not citizens, await a durational residency requirement, aliens coming into the State were, because of their status, treated differently from citizens for a period of time, and during that period of time, the incoming aliens were

---

[2] In *In re Griffiths,* 413 U. S. 717, 718 n. 1 (1973), the Court noted:

"[The plaintiff] is eligible for naturalization by reason of her marriage to a citizen of the United States and residence in the United States for more than three years, 8 U. S. C. § 1430 (a). She has not filed a declaration of intention to become a citizen of the United States, 8 U. S. C. § 1445 (f), and has no present intention of doing so."

The eligibility of plaintiff in that case, however, was not built into the classification scheme. The state-court rule prevented any alien from becoming an attorney, and of course reached those resident aliens who, having not satisfied the jurisdictional prerequisites to citizenship, could not change their disfavored status.

powerless to remove themselves from that disability (unless they could become citizens). There was nothing else the alien could do to avoid the period of discriminatory treatment.

In all of these cases, then, the classification made by the State conformed to the reason underlying the strict scrutiny this Court applied. But it would seem to follow that if a state statute classifies in a way which necessarily avoids the underlying reason for the strict scrutiny, the statute should be viewed in a different light. This is such a case. Under this New York statute, a resident alien has, at all times, the power to remove himself from one classification and to place himself in the other, for, at all times, he may become entitled to benefits either by becoming a citizen *or* by declaring his intention to become a citizen as soon as possible.[3] Here, unlike the other cases, the resident alien is not a member of a discrete and insular minority for purposes of the classification, even during the period that he must remain an alien, because he has at all times the means to remove himself immediately from the disfavored classification. There is no temporal disability since the resident alien may declare an intent, thereby at once removing himself from the disabled class, even if the intent cannot come to fruition for some period of time. Unlike the situation in *Griffiths, Sugarman,* and *Graham,* there exists no period of disability, defined by status, from which the alien cannot escape. The alien is not, there-

---

[3] As the Court notes, the state statutory scheme is challengeable at all only by resident aliens. *Ante,* at 4. While other aliens are also disqualified by the state statute in question, they are also decisively disqualified by federal law from establishing a permanent residence in this country, sec 8 U. S. C. § 1101 (a) (15) (F) (i); 22 CFR § 41.45 (1976); cf. 45 CFR § 177.2 (a) (1976). Since there is no question of the plenary power of the *Federal* Government in this area, see *Mathews* v. *Diaz,* 426 U. S. 67 (1976), the Court is quite properly concerned only with the category of resident aliens, those "lawfully admitted for permanent residence." 8 U. S. C. § 1101 (a) (20). See generally *In re Griffiths, supra,* at 719–722; *Graham* v. *Richardson,* 403 U. S. 365, 371 (1971).

fore, for any period of time, forced into a position as a discrete and insular minority.[4]

Since the New York statute under challenge in this case does *not* create a discrete and insular minority by placing an inevitable disability based on status, the Court's heightened judicial scrutiny is unwarranted. The reason for the more rigorous constitutional test having ceased, the applicability of the test should likewise cease. Applying the rational-basis test, it is obvious that the statutory scheme in question should be sustained. The funds that New York wishes to spend on its higher education assistance programs are, of course, limited. New York's choice to distribute these limited funds to resident citizens and to resident aliens who intend to become citizens, while denying them to aliens who have no intention of becoming citizens, is a natural legislative judgment. By limiting the available pool of recipients to resident citizens and aliens who will become citizens, New York is able to give such recipients a larger payment from the same quantum of funds than would be the case were other aliens recipients as well. A State is entitled to decide, in distributing benefits, that resident citizens, whether or not they will remain residents of New York, are more likely to contribute to the future well-being of the State, either directly (by settling there) or indirectly (by living in some other State, but maintaining economic or social ties with New York or by improving the general well-being of the United States) than are aliens who are unwilling to renounce citizenship in a foreign country, and who may be thought more likely to return there. New

---

[4] The alien, of course, must "give up" (or announce that he intends to give up) his foreign citizenship. See 8 U. S. C. § 1448 (a). In this sense, he must do something that members of the other category need not do in order to be eligible for the "favored" treatment. But, here, what is given up is the factor which distinguishes between the categories. I cannot view this as an impermissible burden which would convert this case into a case like *Griffiths* or *Sugarman*.

York may also decide, in providing student loans pursuant to N. Y. Educ. Law §§ 680–684 (McKinney Supp. 1976), that it will be easier to collect repayment sums from citizens than from aliens, should these loans be defaulted upon. These are permissible legislative judgments. Cf. *McGowan* v. *Maryland,* 366 U. S. 420, 426 (1961); *Ohio Bureau of Employment Services* v. *Hodory,* 431 U. S. 471 (1977). When we deal, as we do here, with questions of economic legislation, our deference to the actions of a State is extremely great. *Dandridge* v. *Williams,* 397 U. S. 471, 485 (1970). New York's decision to deny educational monetary benefits to aliens who do not wish to become citizens of this country, while extending such benefits to citizens and other resident aliens, is rational, and should be sustained.