Wail AHMED, et al., Plaintiffs,

v.

UNIVERSITY OF TOLEDO, et al., Defendants.

No. C 86–7315.

United States District Court, N.D. Ohio, W.D.

June 23, 1986.

Thomas J. Zraik, A.B.L.E., Toledo, Ohio, for plaintiffs.

Theodore M. Rowen, Spengler, Nathanson, Heyman, McCarthy & Durfee, Toledo, Ohio, for defendants.

## FINDINGS OF FACT CONCLUSIONS OF LAW and JUDGMENT

WALINSKI, Senior District Judge.

This class action complaint for declaratory and injunctive relief came on for hearing on May 13, 1986, and after the post trial filings is now decisional.

After a denial of a Temporary Restraining Order on May 5, 1986, the cause was consolidated for a hearing on the merits pursuant to Fed.R.Civ.P. 65(a)(2) with consent. No class has been certified since any injunctive relief the Court might have granted would have inured to the benefit of any putative class.

At the close of the plaintiff's case the Court granted defendant's motion for a directed verdict of dismissal.

### FINDINGS OF FACT

1. Plaintiffs are Wail Ahmed, a citizen of Jordan, and a resident of Kuwait, Hatem Zein, a citizen of Jordan, Ala Al-Abed, a citizen of Jordan and a resident of Kuwait, and Baha Al-Abed, a citizen of Jordan and a resident of Kuwait. All are students at the University of Toledo, and sought to represent a class consisting of the 1500 international students who are in this country temporarily and solely for the purposes of education.

2. Defendants are the Board of Trustees, James McComas, president of the University of Toledo, and the University itself. The University of Toledo is a state university governed by the Board of Trustees. President James McComas is the Chief Executive Officer responsible for policy enforcement.

3. The plaintiffs and the international students are aliens distinguished from immigrant aliens, as defined in the Immigration and Nationality Act, 8 U.S.C. § 1101 *et seq.*:

(15) The term "immigrant" means every alien except an alien who is within one of the following classes of nonimmigrant aliens—

\*　　\*　　\*　　\*　　\*　　\*

(F)(i) an alien having a residence in a foreign country which he has no intention of abandoning, who is a bona fide student qualified to pursue a full course of study and who seeks to enter the United States temporarily and solely for the purpose of pursuing such a course of study at an established college, university, seminary, conservatory, academic high school, elementary school, or other academic institution or in a language training program in the United States, particularly designated by him and approved by the Attorney General after consultation with the Secretary of Education, which institution or place of study shall have agreed to report to the Attorney General the termination of attendance of each nonimmigrant student, and if any such institution of learning or place of study fails to make reports promptly the approval shall be withdrawn, and (ii) the alien spouse and minor chidren of any such alien if accompanying him or following to join him ...

8 U.S.C. § 1101(a)(15)(F)(i). Each of the plaintiffs holds an "F–1" visa. They are thus classified as non-immigrant aliens.

4. The United States Department of Justice, Immigration and Naturalization Service's Regulations regarding nonimmigrant student aliens are found at 8 C.F.R. § 214.2(f). The Regulations provide that a student seeking admission to the United States under 8 U.S.C. § 1101(a)(15)(F)(i) shall not be eligible for admission unless he presents, to Immigration officers upon entry to the United States, Form I–20, properly filled out by himself and the institution to which he is destined. He must also present documentary evidence of the financial ability required by Form I–20. 8 C.F.R. § 214.2(f)(1)(A). The following information must be included on the I–20: a statement that the institution is approved by the Immigration and Naturalization Service for attendance by nonimmigrant students; a statement that the student has been accepted into a specific program at the institution; the expected dates of the student's attendance; the estimated expenses for the academic term; and a statement by the institution that it has specific information that the student has means of support in the amount of the estimated expenses. The student must have a copy of his Form I–20 with him at all times. 8 C.F.R. § 214.2(f)(2).

5. The Regulations further state that persons within the 8 U.S.C. § 1101(a)(15)(F)(i) classification are permitted to engage in off-campus employment only under very limited circumstances. 8 C.F.R. § 214.2(f)(9)(ii). No student may be employed off-campus unless a number of requirements are met. These include that "the student ... has demonstrated economic necessity due to unforeseen circumstances arising subsequent to entry...." 8 C.F.R. § 214.2(f)(9)(ii)(B). Even in the event of such emergency, the Immigration and Naturalization Service will not authorize employment of more than 20 hours per week. A nonimmigrant student who is employed without permission of the Immigration and Naturalization Service is subject to deportation. *Tashnizi v. Immigration and Naturalization Service,* 585 F.2d 781 (5th Cir.1978).

6. On October 19, 1972, defendant Board of Trustees of the University of Toledo adopted Resolution No. 8–73 which states as follows:

> BE IT RESOLVED, that the Board of Trustees of the University of Toledo require all entering foreign students to carry health insurance equal to the Blue Cross-Blue Shield plan offered University students or a comparable health insurance policy, effective at once. All foreign students shall be required to have such health insurance effective Fall Quarter, 1973. The Office of the Foreign Student Advisor shall be charged with enforcing this regulation even to the extent that it may cancel a student's registration after due notification.

7. In implementing the policy set forth in Resolution 8–73, the University defines the terms "foreign student" and "international student" synonymously and to include only students who are in this country on nonimmigrant student visas, such as F–1s.

8. The policy embodied in Resolution 8–73 applies to international students. It does not apply to University students who are United States citizens or who are resident aliens. The University makes health insurance available to such students on a voluntary basis.

9. Since October, 1983, each Form I–20 prepared by the University of Toledo for use by its international students has contained the following statement: "Student will be required to purchase and maintain medical, hospitalization, and repatriation insurance."

10. Each of the three plaintiffs who now state that they object to the policy embodied in Resolution No. 8–73 on religious grounds received, in their home country, before coming to this country to attend the University of Toledo, a Form I–20 which included the above-quoted statement on its first page. (See Defendants' Exhibits J, I, K.) Each plaintiff signed the Form I–20 which was prepared and sent to him by the University of Toledo, indicating that he was financially able to support himself while in the United States while pursuing a full course of study and further indicating "I agree to comply with the above terms and with any other conditions of my admission, and those of any extension to stay."

11. Students also receive notice of the University's insurance requirement for international students before they enroll at the University of Toledo, in catalogue and other pre-arrival information. (See Defendants' Ex. H and I).

12. On March 25, 1986, during spring break, several University of Toledo international students were involved in a serious automobile accident in Canada. Three of the students did not have the insurance mandated by Resolution 8–73.

13. University of Toledo staff members determined the physical condition of students and then called the students' parents abroad to inform them of the accident and of their children's condition. The University later leased automobiles which University staff members drove to Canada and via which they transported the more seriously injured students to Toledo.

14. Following the accident, President James McComas learned that the insurance policy was not being strictly enforced. It was determined that the policy must be enforced, beginning spring quarter, 1986.

15. By letter of March 27, 1986, Lancelot Thompson, Vice President for Student Affairs, University of Toledo, informed international students that the mandatory health insurance policy would be strictly enforced beginning spring quarter, 1986. (Defendants' Ex. B). Students were informed that they were to show proof of insurance coverage at the International Student Program (ISP) office by April 18, 1986. They were informed that they could purchase insurance at the ISP office if they did not have insurance. They were further informed that failure to purchase and maintain health insurance would result in their being dropped from classes and losing University assistance. Each plaintiff received a copy of this letter. None went to the ISP office in response to the letter.

16. By April 18, 1986, approximately 380 international students had not yet showed compliance with the insurance policy.

17. In the evening of April 21, 1986, staff members of the ISP attempted to reach all non-complying international students by telephone. They informed students of the necessity of their showing proof of insurance. Plaintiff Hatem Zein received such a call.

18. By certified letter dated April 18, 1986, Thomas C. Clapp, Dean of Continuing Education, informed the University of Toledo's non-complying international students of the University's insurance policy, as embodied in Resolution No. 8–73. (Defendants' Ex. C). He informed the students that the deadline for compliance was extended to May 2, 1986, and that four payment options were available should students wish to purchase insurance from the University's insurance carrier. Total cost of insurance coverage until October 1, 1986 through the University's carrier was $108.00. Students further were informed: "If you cannot meet one of these options

because of financial problems or other reasons, contact Dr. Deborah Piere in the International Student Programs office immediately." Students were further advised that if they did not comply by May 2, 1986 they would be administratively withdrawn from classes and their financial aid from the University, if any, would be discontinued.

19. Each of the plaintiffs either received a copy of this letter or was otherwise aware of its contents. None of the plaintiffs went to the ISP office in response to Dean Clapp's letter.

20. Plaintiffs filed this lawsuit on May 2, 1986. Defendants' counsel agreed on that date that the University would not begin the disenrollment process for non-complying students until after plaintiffs' motion for temporary restraining order was heard.

21. The Court denied plaintiff's motion for temporary restraining order on May 5, 1986. Thereafter, the University once again extended the deadline by which students were to show compliance, this time until May 9, 1986.

22. The plaintiffs were aware that the deadline had been extended and that ISP personnel were available to discuss insurance-related problems with them. Plaintiff Baha Al-Amed and Hatrem Zein went to the ISP office after May 5, 1986, but they did not show proof of insurance or arrange to purchase same.

23. The parties have stipulated, and this Court so finds, that neither plaintiffs nor their counsel prior to the filing of this lawsuit raised with defendants or their counsel any objection to the defendants' insurance policy based upon religious grounds.

24. The Court finds that plaintiffs' religious claim was an afterthought. Their testimony established that none of the plaintiffs are devout practitioners of the Sunni Moslem religion. The Court finds that plaintiffs' refusal to comply with the University's insurance policy was not based on the good faith belief that health insurance was contrary to their religion.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and § 1343(3) over a constitutional challenge to a policy of the defendants adopted and implemented acting under color of state law. (See Ohio Rev. Code, Chap. 3360).

■ 2. The Equal Protection Clause, of the Fourteenth Amendment of the United States Constitution provides that "[n]o State shall ... deny to any person within its jurisdiction the equal protection of the law." International students are "persons" within the meaning of the Equal Protections Clause. *Nyquist v. Mauclet,* 432 U.S. 1, 97 S.Ct. 2120, 53 L.Ed.2d 63 (1977); *Yick wo v. Hopkins,* 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886).

■ 3. The policy embodied in Resolution 8–73 is not in conflict with the Equal Protection Clause. Resident alien students are not subject to the policy. Therefore, the University's classification is not based upon "alienage" or other suspect classification.

■ 4. International students (nonimmigrant alien students) are not a suspect classification. See *Graham v. Richardson,* 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971). In cases in which the Supreme Court has applied the strict scrutiny standard of review to a state classification affecting aliens, the challenged statute or practice discriminated against permanent resident aliens. See, e.g., *Nyquist v. Mauclet,* 432 U.S. 1, 97 S.Ct. 2120, 53 L.Ed.2d 63 (1977); *Examining Board v. Flores de Otero,* 426 U.S. 572, 96 S.Ct. 2264, 49 L.Ed.2d 65 (1976); *In re Griffiths,* 413 U.S. 717, 93 S.Ct. 2851, 37 L.Ed.2d 910 (1973); *Sugarman v. Dougall,* 413 U.S. 634, 93 S.Ct. 2842, 37 L.Ed.2d 853 (1973); *Graham v. Richardson,* 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971). The Supreme Court has not suggested that nonimmigrant aliens are within the class protected under the suspect classification doctrine. See Rosberg, "The Protection of Aliens from Discriminatory Treatment by the National

Government," 1977, Sup.Ct.Rev. 275, 312 n. 140.

The policy in question does not strike at the students' ability to exist in the community. Rather, the policy seeks to protect students' ability to exist in the community, taking cognizance of the high costs of health care in this country. See *Foley v. Connelie*, 435 U.S. 291, 295, 98 S.Ct. 1067, 1070, 55 L.Ed.2d 287 (1978).

Strict scrutiny is not applicable where it is unreasonable to impute to the federal government a policy against the University's insurance scheme. The Court finds that the University's policy is consistent with the purposes of federal immigration law. The federal government treats this subclass somewhat differently than other groups in requiring a demonstration of their financial responsibility. Equal protection is not violated by the treatment of F–1 students differently than their American counterparts. *Anwo v. Immigration and Naturalization Services*, 607 F.2d 435 (D.C.Cir.1979) (Deportation of an F–1 student convicted of a marijuana offense does not violate the student's right to equal protection although a citizen convicted of the same offense would be subject to a much less severe sanction).

■ 5. The Court finds that the University's health insurance policy must be judged by the rational basis test. Under that test, it is the plaintiffs' burden to demonstrate that the University's health insurance policy is wholly unrelated to a legitimate state end. *McGowan v. Maryland*, 366 U.S. 420, 426–427, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393 (1961). If "the distinctions drawn have some basis in practical experience," *South Carolina v. Katzenbach*, 383 U.S. 301, 333, 86 S.Ct. 803, 821, 15 L.Ed.2d 769 (1966), the plaintiffs must fail. In this case, the presumption of constitutionality which must be accorded to the University's policy stands because the challenged classification, "judged by reference to characteristics typical of the affected classes" *Califano v. Jobst*, 434 U.S. 47, 55, 98 S.Ct. 95, 100, 54 L.Ed.2d 228 (1977), has "some basis in practical experience." The rationale for the policy is the protec-

tion of foreign students in the face of medical needs which, absent insurance, could be a potential medical crises. International students do not have a constitutional right to attend American universities without complying with the institutions' reasonable regulations. See *Plyler v. Doe*, 457 U.S. 202, 224, 102 S.Ct. 2382, 2398, 72 L.Ed.2d 786 (1982).

■ 6. The Due Process Clause of the Fourteenth Amendment provides that "[n]o State shall ... deprive any person of life, liberty, or property without due process of law." Alien inhabitants must be afforded due process by both state and federal governments. Admission to the United States is a privilege granted to an alien only upon such terms as the United States shall prescribe. The University's enforcement of the insurance policy is in accord with due process. The court finds that the university has provided its international students with ample notice of its insurance policy and ample opportunity to comply and/or to be heard. The plaintiffs herein did not avail themselves of the University's due process procedures. (See also Defendants' Ex. F).

■ 7. The University's insurance policy is not barred by Article VI, Clause 2 of the United States Constitution, the Supremacy Clause. The Court finds that the insurance requirement is a logical and legal extension of the policies of Congress and the Immigration and Naturalization Service established in 8 U.S.C. § 1101(a)(15)(F)(i) and the Regulations thereunder. The federal government classifies aliens who legally enter this country either as immigrants or as nonimmigrants. Within the latter class are a number of subclasses, one of which is the student group in question. The federal policy requires that these students be financialy responsible: the institution which the student will attend must certify that the student is entering this country with sufficient financial resources to meet *all* of his or her anticipated expenses. The requirement that this group of students maintain health insurance furthers the federal policy requiring their financial responsibility. The policy both mir-

rors federal objectives and furthers legitimate state goals. *Plyler v. Doe,* 457 U.S. 202, 225, 102 S.Ct. 2382, 2398, 72 L.Ed.2d 786 (1982); *DeCanas v. Bica,* 424 U.S. 351, 96 S.Ct. 933, 47 L.Ed.2d 43 (1976). F–1 visa holders, unlike the G–4 visa holders who were succesfull plaintiffs in *Toll v. Moreno,* 458 U.S. 1, 102 S.Ct. 2977, 73 L.Ed.2d 563 (1982), are not afforded special economic protection by the federal government (In *Toll,* a University of Maryland Policy required G–4 visa holders to pay out-of-state tuition while allowing other aliens to establish Maryland domicile and pay in-state tuition. Court held the University's tuition policy thwarted special federal protection accorded to G–4 visa holders).

■ 8. The University's policy is not in conflict with the Free Exercise Clause of the United States Constitution, First and Fourteenth Amendments. The policy imposes no serious interference on religious freedom. Plaintiffs have not shown that the policy burdens the practice of their religion. *United States v. Lee,* 455 U.S. 252, 102 S.Ct. 1051, 71 L.Ed.2d 127 (1982); *Thomas v. Review Board,* 450 U.S. 707, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981); *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972).

■ 9. Had plaintiffs made the requisite showing that the University's policy burdened their practice of religion, the Court would determine that the policy is the least restrictive means of achieving an overriding governmental interest. *State v. Lee,* 455 U.S. 252, 102 S.Ct. 1051, 71 L.Ed.2d 127 (1982); *Braunfeld v. Brown,* 366 U.S. 599, 81 S.Ct. 1144, 6 L.Ed.2d 563 (1961). The policy furthers the legitimate state end of preventing catastrophic harm to students. It furthers the federal policy of assuring the F–1 visa holders are financially responsible. In ruling otherwise, the Court would make the free medical care to which plaintiffs are accustomed in their home country the standard to be imposed in this country for all students in the Sunni Moslem class. "To maintain an organized society that guarantees religious freedom to a great variety of faiths requires that some religious practices yield to the common good.... [E]very person cannot be shielded from all the burdens incident to exercising every aspect of the right to practice religious beliefs." *Lee,* 455 U.S. at 259, 102 S.Ct. at 1056.

Accordingly, the Court declares for the defendants on the constitutionality of the defendant's Resolution 8–73, and denies injunctive relief.

This cause is dismissed with prejudice at plaintiff's costs.

IT IS SO ORDERED.