J. and R. DOE as guardian ad litem for I. Doe, J. D. Doe, E. Doe, D. Doe and O. Doe, J. and E. Roe as guardian ad litem for O. Roe, F. Roe, and N. Roe, F. Boe as guardian ad litem for Z. Boe, S. Boe, and X. Boe, H. and J. Loe as guardian ad litem for A. Loe, L. Loe, M. Loe, G. Loe, and R. Loe, on behalf of themselves and others similarly situated,

v.

James PLYLER, Superintendent of the Tyler Independent School District, in his official capacity, Lewis Lampkin, Charles Childers, Carl Ross, Martin Edwards, Vernon Goss, Michael Breedlove, and Robert Randall, in their official capacity as Members of the Board of Trustees of the Tyler Independent School District.

Civ. A. No. TY–77–261–CA.

United States District Court,
E. D. Texas,
Tyler Division.

Sept. 14, 1978.

Peter D. Roos, Mexican-American Legal Defense Fund, San Francisco, Cal., Larry R. Daves, Tyler, Tex., Michael B. Wise, U. S. Dept. of Justice, Education Section, Civil

Rights Division, Washington, D. C., for plaintiffs.

John C. Hardy, Tyler, Tex., Richard L. Arnett, Asst. Atty. Gen., Austin, Tex., for defendants.

## MEMORANDUM OPINION

JUSTICE, District Judge.

### Procedural History

This civil action began in September, 1977, when plaintiffs, a group of Mexican children who had entered the United States illegally and currently reside in Smith County, Texas,[1] sought injunctive and declaratory relief from this court by and through their parents, as next friends, against their exclusion from the public schools in the Tyler Independent School District ("Tyler I.S.D."). The defendant Board of Trustees of Tyler I.S.D. had refused to enroll any undocumented child,[2] absent a tuition fee of $1,000 per year, pursuant to section 21.031 of the Texas Education Code (Vernon Supp.1976) ("section 21.031"). This statute provides, in pertinent part:

(a) All children who are citizens of the United States or legally admitted aliens and who are over the age of five years and under the age of 21 years on the first day of September of any scholastic year shall be entitled to the benefits of the Available School Fund for that year.

(b) Every child in this state who is a citizen of the United States or a legally admitted alien and who is over the age of five years and not over the age of 21 years on the first day of September of the year in which admission is sought shall be permitted to attend the public free schools of the district in which he resides or in which his parent, guardian, or the person having lawful control of him resides at the time he applies for admission.

(c) The board of trustees of any public free school district of this state shall admit into the public free schools of the district free of tuition all persons who are either citizens of the United States or legally admitted aliens and who are over five and not over 21 years of age at the beginning of the scholastic year if such a person or his parent, guardian or person having lawful control resides within the school district.

Although section 21.031 had been enacted in 1975,[3] the Tyler I.S.D. continued to enroll

---

1. The minor plaintiffs were represented by their parent or parents as guardians *ad litem.* Prior to the trial of this case on the merits, the court ordered that the action be maintained as a class action on behalf of all undocumented school-aged children of Mexican origin residing within the boundaries of the Tyler Independent School District.

2. Because of the focus on documentation in both the challenged Texas statute and the Tyler I.S.D. policy, the excluded children will be referred to throughout this opinion as "undocumented children." The court will use the term "illegal aliens" to refer generally to those persons who reside in the United States in violation of the Immigration and Nationality Act. Although the term may have unpleasant connotations, this court has chosen it in the interests of economy and clarity of expression.

3. Prior to its amendment in 1975, Tex.Educ. Code § 21.031 provided:

 (a) *All children without regard to color* over the age of six years and under the age of 18 years on the first day of September of any scholastic year shall be entitled to the benefits of the Available School Fund for that year.

 (b) *Every child in this state* over the age of six years and not over the age of 21 years on the first day of September of the year in which admission is sought shall be permitted to attend the public free schools of the district in which he resides or in which his parent, guardian, or the person having lawful control of him resides at the time he applies for admission notwithstanding the fact that he may have been enumerated in the scholastic census of a different district or may have attended school elsewhere for a part of the year.

 (c) The board of trustees of any public free school district of this state shall admit into the public free schools of the district free of tuition *all persons* over six and not over 21 years of age at the beginning of the scholastic year if such person or his parent, guardian or person having lawful control resides within the school district. (Emphasis added.)

undocumented children, free of charge, until the 1977–1978 school year, when they observed the increasing number of such children. In July, 1977, fearing that the Tyler I.S.D. would become a "haven" for illegal aliens, the Board of Trustees of the school district adopted the following policy, designed to implement the statute:

> The Tyler Independent School District shall enroll all qualified students who are citizens of the United States or legally admitted aliens, and who are residents of this school district, free of tuition charge. Illegal alien children may enroll and attend schools in the Tyler Independent School District by payment of the full tuition fee.

> A legally admitted alien is one who has documentation that he or she is legally in the United States, or a person who is in the process of securing documentation from the United States Immigration Service, and the Service will state that the person is being processed and will be admitted with proper documentation.

A complaint and motion for preliminary injunction were filed by plaintiffs on September 6, 1977. The complaint alleged that the Texas statute, as implemented by the Tyler I.S.D. policy, denied plaintiffs equal protection of the laws and, further, that the statute was preempted by the federal Immigration and Nationality Act, 8 U.S.C. §§ 1101 *et seq.*[4] On the same day, the court set a hearing on the application for prelimi-

nary injunction for September 9, and immediately notified the Attorney General of the State of Texas, the United States Attorney for the Eastern District of Texas, and the United States Department of Justice of the pendency and nature of the lawsuit.

At the September 9 hearing, the court granted the state's oral motion to intervene as a party defendant, made by and through the Attorney General. All parties, as well as the United States Department of Justice, were represented. Fearing disclosure of their identities, plaintiffs had filed their complaint under pseudonyms, and at the hearing moved for a protective order limiting the circumstances under which, and the persons to whom, plaintiffs' true names might be revealed. The motion was granted and the order issued; however, the court advised the Department of Justice representatives that the order did not bind any officer of the United States who might desire to take action against plaintiffs and their parents for violations of the federal immigration laws.

The court thereupon proceeded to receive evidence, including testimony by the parents of the plaintiffs. Finding that plaintiffs had shown probability of success on the merits as to their equal protection claim, and that they would suffer irreparable harm should interim relief be denied, the court granted the application for preliminary injunction. Findings of Fact and Conclusions of Law were entered on Sep-

---

It is perhaps of more than mere historical interest that the State Attorney General ruled that alien children were entitled under this statute to attend public school regardless of whether they were legal or illegal residents. Att'y Gen.Op. H–586 (1975). The opinion further stated:

> We believe the words "all" and "every" as contained in section 21.031 . . . do not permit exceptions to be created by local school boards.
> Whether the Legislature itself may establish an exception for illegal aliens has not been decided by the higher courts. While we recognize that the United States Supreme Court could sustain such an exercise of legislative power, the existing case law indicates that the rights of illegal aliens are protected

by 42 U.S.C.A. and the Fourteenth Amendment to the United States Constitution.

Att'y Gen.Op. H–586 (1975), citing *Bolanos v. Kiley,* 509 F.2d 1023 (2d Cir. 1975); *Williams v. Williams,* 328 F.Supp. 1380 (D.V.I.1971); *Martinez v. Fox Valley Bus Lines,* 17 F.Supp. 576 (N.D.Ill.1936); *Commercial Standard Fire & Marine Co. v. Galindo,* 484 S.W.2d 635 (Tex. Civ.App.—El Paso 1972, writ ref'd n.r.e.). *See infra* at 578–579.

4. The complaint also alleges causes of action based on denial of due process and discrimination on the basis of national origin. These claims appear to have dropped out by the time of trial on the merits, and they are not argued separately in plaintiffs' trial brief.

tember 12, 1977. A final hearing was scheduled for December 12, 1977.

The final hearing continued for two days. The State of Texas, by the Attorney General, had filed an answer and participated fully as a defendant. The United States Department of Justice, pursuant to motion, was granted leave to participate as an *amicus curiae*. While the attorney representing the Government questioned several of the witnesses, he did not produce any independent witnesses. Plaintiffs offered into evidence the record of proceedings at the September hearing and, in addition, presented testimony of four expert witnesses. Plaintiffs' witnesses testified on the following topics: (1) the historical framework of illegal emigration from Mexico into the United States; (2) the general characteristics of illegal immigrants; (3) school financing in Texas; and (4) the educational needs of Mexican children. The defendant school board presented testimony from the Superintendent and Business Manager of the Tyler I.S.D. The State of Texas presented witnesses from the United States Immigration and Naturalization Service, the Texas Education Agency, and the Houston Independent School District ("Houston I.S.D."), as well as two expert witnesses, who testified as to immigration and educational needs of Mexican students. In her opening statement, the Assistant Attorney General described the nature and scope of the state's evidence:

> Basically, what we will attempt to show or what we will show is the impact on the educational system, that it impacts to the detriment of the citizens, the legally admitted child, particularly in the border areas, and the areas in which you find large Mexican-American enclaves, which Tyler is not one of those areas. That's why you don't see the impact from Tyler like you see in the Houston I.S.D., Brownsville, San Antonio, Eagle Pass, Abilene—different places around the state where there are Mexican-American enclaves, mostly the border areas.

Record of Proceedings, Dec. 12, 16, 1977 ("Tr. 12/12"), at 163. At the conclusion of the hearing and after consultation with the attorneys, the court issued a briefing schedule.

Early in January, 1978, plaintiffs moved to amend their complaint to conform to the evidence and to add the Governor of Texas and the Commissioner of Education of the State of Texas as parties to the action. The motion was granted on January 5, 1978, and the amended complaint filed the same day. More than two months later, the State of Texas filed a motion for reconsideration and a motion to present additional evidence, based on the grounds that the Attorney General's office represented neither the Governor of Texas nor the Commissioner of Education; that counsel for the state and the prospective witnesses had always assumed that the instant civil action would affect only the Tyler I.S.D. and not other school districts throughout the state; and that the evidence offered at trial had been consciously limited by this understanding.

Immediately prior to the trial on the merits, plaintiffs filed a brief which included references to the evidence they would offer at trial. The United States filed a post-trial brief, including substantial references to the evidence, in which it took the position that defendants' statute and policy violated the fourteenth amendment guarantee of equal protection of the laws, but were not invalid under the federal preemption doctrine. The United States had already submitted to the court and the parties copies of the Preliminary Report of the Domestic Council Committee on Illegal Aliens, December 1976 ("Preliminary Report"). The State of Texas chose to submit its briefs filed in a similar challenge to section 21.031, *Hernandez v. Houston Independent School District,* 558 S.W.2d 121 (Tex.Civ.App.—Austin 1977, writ ref'd n.r.e.).

The *Hernandez* case had been brought more or less concurrently with the instant action by a group of undocumented children living within the Houston I.S.D. The State Board of Education denied relief, and its order was affirmed by the District Court of Travis County, 126th Judicial District of Texas, which granted summary judgment.

Additional defendants in the state. court action were the Texas Education Agency and the State of Texas. Subsequent to this court's entry of the preliminary injunction in the instant case, the Court of Civil Appeals for the Third Supreme Judicial District of the State of Texas affirmed the judgment of the district court and upheld the constitutionality of section 21.031. *Hernandez v. Houston Independent School District, supra.* The Supreme Court of Texas refused an application for the writ of error, with the notation, "No reversible error." Defendants have not argued that the *Hernandez* decision is in any way binding on this court in the case before the court.

### Findings of Fact

The minor plaintiffs herein are all school-aged children, born in the Republic of Mexico, who reside with their parents within the boundaries of the Tyler I.S.D. None of the minor plaintiffs possesses documentation that he or she is legally in the United States or is in the process of securing such documentation. There are probably thirty to forty undocumented school-aged children residing in the Tyler I.S.D. in addition to the named plaintiffs.

Each minor plaintiff is represented in this civil action by his or her parents, as next friends. All of the parents in question are aliens of Mexican origin, who illegally entered and remained in the United States, and who reside within the boundaries of the Tyler I.S.D. The families represented in this civil action have lived in the city of Tyler for a period of three to thirteen years. Each such family includes at least one child, not of school age, who is a citizen of the United States by virtue of his or her birth in the United States.

The Tyler I.S.D. constitutes a public school district, which receives some federal funding in addition to state and local funds. James Plyler is the Superintendent of the Tyler I.S.D. The managing board of the district is the Board of Trustees.

Section 21.031 of the Texas Education Code (Vernon Supp.1976), effective September 1, 1975, limits the benefit of the state's "Available School Fund" to children between the ages of five and twenty-one, who are citizens of the United States or legally admitted aliens; it limits admission to the public free schools in any district to such citizens or lawfully resident children whose parents or guardians reside within the district. (Section 21.031 is set forth in the procedural history of this case, *supra*.)

On July 21, 1977, acting in furtherance of and pursuant to section 21.031, the Tyler I.S.D. Board of Trustees promulgated a policy concerning the financing and control of education for illegally admitted aliens. This policy, set forth in full, *supra*, permits the enrollment of illegal alien children only upon payment of tuition. The policy defines illegal alien children as those who neither possess documentation that they are legally within the United States nor are in the process of successfully securing such documentation.[5]

The Tyler policy has been implemented by defendants and their agents since the beginning of the 1977 school year. In accordance with that policy and based upon an educational expense analysis conducted by the Administrative Office of the Tyler I.S.D., an amount of tuition of $1,000.00 per year has been set as a fee for each child residing within the Tyler I.S.D. who is neither a citizen of the United States, a legally admitted alien, nor an illegal alien who has begun processing his papers for legal admission with the United States Immigration Service. The sum of $1,000.00, representing the approximate proportional cost of educating a single child in the Tyler I.S.D., was arrived at by dividing the district's annual operating budget, $18.5 million, by the approximate number of enrolled students, 16,-000.

All of the parents of the plaintiffs were informed by school officials that their children could not attend school without either producing the required documents or paying the $1,000 tuition fee. There is no

---

**5.** *See* note 2 *supra*.

reasonable expectation that any of the named plaintiffs or their parents can obtain the required documents from the United States Immigration and Naturalization Service.[6]

Except for the existence of section 21.031 and the Tyler I.S.D. policy, all named plaintiffs would be eligible for admission to the Tyler I.S.D. on a tuition-free basis and would currently be enrolled in the Tyler public schools. All minor plaintiffs, with the exception of two, attended the Tyler I.S.D. schools in the school year 1976–1977. The two excepted children attended the Tyler I.S.D. Head Start Program in the summer of 1977, preparatory to entering the first grade. Because of their poverty, none of the parents of the named plaintiffs can afford to pay the tuition fee of $1,000 or any other significant sum. None of the minor plaintiffs possesses independent resources to pay such tuition. Prior to the issuance of the preliminary injunction in this civil action, none of the named plaintiffs was attending school in the Tyler I.S.D., except for J. D. Doe. Two undocumented children are currently attending the Tyler public schools as tuition-paying students.

Were the preliminary injunction issued by this court not in effect, none of the named plaintiffs, with the exception of those children identified as Doe, would currently be attending any school. The Doe children, except for J.D. Doe, were enrolled in a Catholic school after being rejected for admission to the Tyler I.S.D. on a tuition-free basis. Doe works for the Catholic school in Tyler on weekends, in exchange for his children's attendance.

The parents of plaintiffs Doe are owners of real and personal property in the Tyler I.S.D. All other parents of minor plaintiffs rent housing within the Tyler I.S.D. At least one parent of those children identified as Doe, Roe, and Loe is employed, and federal income and Social Security taxes are withheld from his or her paycheck. Three of the four families represented had purchased at least one automobile and could produce registration and title documentation.

The primary purpose of section 21.031, as characterized by the State of Texas, is to employ public educational funds to provide education to United States citizens and legally admitted aliens.[7] The Tyler I.S.D. policy was implemented pursuant to the state statute, in order to prevent the potential drain on local educational funds should Tyler become a haven for illegal aliens. The court finds, however, that neither the statute nor the policy has either the purpose or the effect of keeping illegal aliens out of the State of Texas.

Increasing numbers of Mexican nationals have emigrated into the United States in recent years. A large portion of these immigrants have settled in Texas, resulting in significant increases in public school enrollment. For example, Defendants' Exhibits 2 and 3 show that the number of Mexican alien students enrolled rose from 44,799 in 1975–76 to 51,348 in 1976–77, increasing the statewide percentage of Mexican alien children in the public schools from 1.59 to 1.8 percent. The great majority of such children are assumed to be legal residents. Tr.

**6.** The basis for this conclusion is that none of the minor plaintiffs nor their parents appears to satisfy any of the preferences which govern eligibility for permanent resident status. As explained by William J. Chambers, District Director of the Dallas District of the United States Immigration and Naturalization Service, a witness for the State of Texas at the preliminary injunction hearing, eligibility derives basically from two sources: family relationship with either a United States citizen or a permanent resident alien, or possession of certain occupational skills. Specifically, a United States citizen or lawful permanent resident can

petition for immigration of a parent, spouse, child or sibling. A person must be 21 years of age in order to petition on behalf of a parent or sibling. Prerequisites for occupational preferences are either specialized professional skills or any skills of which the United States is at a given time experiencing a shortage. *See* 8 U.S. C.A. §§ 1151(b) and 1153(a)(1)–(a)(6).

**7.** The state court's conclusions regarding the purpose of § 21.031 in effect restate the state's position as expressed in its Brief in Opposition to Application for Writ of Error. For an extensive discussion of this purpose, see *infra*.

1/16 at 184. This wave of migration has presented grave problems for the public schools in Texas. The mere increase in population, without regard to any special characteristics of Mexican immigrant children as a class, has meant that existing school facilities in the impacted areas are physically inadequate. The failure of some school districts to build new facilities or augment existing ones has necessarily resulted in overcrowding of school buildings and classrooms.

The State of Texas is deeply concerned with the growing impact of Mexican migration on its public schools. Defendants' Exhibit 6, the Mexican Immigrant-Alien Student Study, 1975–76, chronicles the development of this concern, which prompted a resolution of the State Board of Education in July, 1975, recognizing the need for further study of the problem. Subsequently, an in-depth investigation of the problem in the districts bordering the Republic of Mexico was conducted by the Region One Education Service Center, in Edinburg, Texas. The Texas Education Agency effected a survey of the problem in the remainder of the state. These studies, introduced into evidence by the State, reveal that overcrowding has reached serious, indeed "atrocious", proportions in the border areas and in metropolitan districts. The Region One Study identifies further characteristics, peculiar to Mexican immigrants, exacerbating the problem: the children generally speak little or no English and are badly educated and overage for their grade level. Special bilingual education for these children is indispensable, yet it is difficult to find qualified personnel for such programs, which also require a disproportionate amount of teacher attention. Additionally, these children tend to come from poor families. Their residence in a school district thus does little to offset the additional cost by adding to the tax base.

The state's witnesses, Thomas Anderson (a representative of the Texas Education Agency), John Eaton (Associate Superintendent of Houston I.S.D.), and Jim Bob Hensley (author of Defendants' Exhibit 6), expressed the opinion that the major justification for section 21.031 was its partial solution to the educational difficulties caused by migration from Mexico in general. No convincing testimony was presented, however, that singled out undocumented children as particularly problematic.[8] The characteristics of legally admitted, Mexican-born children, as a class, are very similar, if not identical, to those of undocumented Mexican-born children. Typical of the undifferentiated analysis of the problem is the testimony of Jim Bob Hensley that a "national policy had permitted a flow of immigrants into the country, and a local school district was being penalized for that," Tr. 12/12 at 302, and of John Eaton that "it would impact, if we had more Hispanic children coming in . . ." Tr. 12/12 at 259.

The evidence discloses that the exclusion of all undocumented children from the public schools in Texas would eventually result in economies at some level; but the savings are unpredictable both in amount and distribution. Approximately twenty-five percent of educational expenditures in Texas are in fixed cost areas, i. e., administrative, maintenance, and operational costs, which are not diminished by moderate declines in student enrollment. The largest item in variable costs is teacher salaries, which require substantial and concentrated decline in enrollment before any economies result. Generally, a decrease of twenty to thirty students at one time, in a given grade and in a given school, is required in order to justify the dismissal of one teacher. Even then, systems of tenure and seniority operate to minimize savings, since the first teachers to be dismissed are ordinarily those

---

**8.** In her opening statement, counsel for the state argued that "[t]here are cost factors which fall outside the average daily attendance costs in terms of lost textbooks, problems you would not have with the average student." Tr. 12/12 at 164. However, not a shred of evidence was ever offered to substantiate the suggestion that undocumented children tend to lose or "remove" textbooks at a higher rate than their citizen or lawfully resident schoolmates.

with the lowest salaries. Hence, the proportional cost (operating budget divided by enrollment) is a very inaccurate indicator of the incremental expense of educating additional students.

The connection between the "economy measure" of excluding undocumented children from the benefits of the Available School Fund and increasing educational quality for the remaining students was shown to be unreliable, and often perverse in operation. Educational funds in Texas come from state, local and federal sources. A local district's allotment from state funds depends, in part, on its average daily attendance ("ADA"). Prior to the enactment of section 21.031 in 1975, a district could include undocumented children in its ADA and receive state funds accordingly. Under section 21.031, however, a district is required to exclude undocumented children from its ADA, decreasing the amount of state funds it receives. Meanwhile, the diminished enrollment, by reason of the factors described above, is unlikely to have resulted in any savings to the local district. The school district is then forced to choose between increasing its own contribution, so as to maintain the current level of expenditures, or cutting back on its programs. Although the state will have saved money, it will not necessarily have improved the quality of education.

The federal government funds the free breakfast, lunch, and clothing programs for which many children of Mexican origin are eligible, whether or not they are legal residents. The largest single source of funds for bilingual education is the federal government, which pays for approximately forty-five percent of the cost. Approximately eighty percent of the remainder is paid from local funds; twenty percent is paid by the state.

In the Tyler I.S.D., the impact of the undocumented children on the school system (at most sixty out of an enrollment of 16,000 in 1977) has been negligible, as were the savings to the district after exclusion of the children. Dr. James Plyler, Superintendent of Tyler I.S.D., testified that the admission of undocumented children would raise the number of children of limited English-speaking ability to twenty-two kindergarten students and twenty first-grade students, triggering the implementation of a formal bilingual education program under state law. The district is already, from its own sense of educational priorities, employing three bilingual teachers. Implementation of the statutory program would require additional teachers and compliance with certain administrative procedures.

In 1976 the Immigration and Naturalización Service ("I.N.S.") estimated that approximately four to five thousand undocumented children resided in the Houston I.S.D.,[9] which had a total enrollment of 206,998 students. The total proportional cost of educating a needy Mexican child, whether a legal or an illegal resident, was $1,740.41 (including free lunch, free breakfast, free clothing, and bilingual education, in addition to the regular curriculum); this is $400 to $500 more than the proportional cost of educating what Associate Superintendent Eaton designated as the "average pupil".

■ The predictable effects of depriving an undocumented child of an education are clear and undisputed. Already disadvantaged as a result of poverty, lack of English-speaking ability, and undeniable racial prejudices, these children, without an education, will become permanently locked into the lowest socio-economic class. Furthermore, witnesses from both sides testified that the illegal alien of today may well be the legal alien of tomorrow. According to Dr. Gilbert Cardenas, plaintiffs' expert on migration, the majority (fifty to sixty percent) of current legal alien workers were formerly illegal aliens. Roland Heston, District Director of the Houston District of I.N.S., a witness for the state, confirmed that undocumented children can and do live in the United States for years, and adjust their status through marriage to a citizen or permanent resident. The court also takes

9. The court finds only that the estimate was made, not that it is reliable.

judicial notice of various presidential and legislative proposals that would legalize the status of many currently undocumented children. *See, e. g.*, Office of the White House Press Secretary, President's Message to the Congress on Undocumented Aliens at 5 (Aug. 4, 1977).

### Generalizations About Illegal Aliens

Testimony and exhibits received into evidence during the trial of this case attempted to describe the alien population illegally in Texas. There is little dispute about most such generalizations, but they are made in the face of what the Domestic Council's Preliminary Report calls a "dramatic lack of reliable information" (Preliminary Report at 235); thus this court does not desire to vest them with the certainty and authority ordinarily associated with findings of fact. However, the following tentative conclusions revealed by various studies have been of interest to the court in its consideration of the case.

Estimates of the number of illegal Mexican aliens in the United States vary widely and are inherently unreliable by reason of the clandestine nature of the illegal population. Marion Houstoun, one of plaintiffs' migration experts and co-author of the North-Houstoun Study,[10] estimated that there are 2.7 million Mexicans illegally in the United States and 675,000 in Texas. This was thought to be a conservative estimate by other witnesses questioned about the matter. The I.N.S. no longer makes estimates.

The impetus for illegal migration is predominantly economic, and consequently its principal impact in the United States is on the labor market. The vast majority of illegal Mexican immigrants are young adult males (averaging around thirty years old) seeking employment opportunities in this country.[11] Indeed, the great majority of the illegal alien class is not of concern in this case, since these workers are either single or leave their families in Mexico and come to the United States for short periods of time. Much of the earnings of these illegal immigrants is sent to their dependents in Mexico. This case mainly concerns a very small sub-class of illegal aliens with very different characteristics, that is, entire families who have migrated illegally and—for all practical purposes—permanently to the United States.

A few available studies tend to refute—although not conclusively—allegations that illegal aliens, as a class, produce a substantial drain on public services. Two reasons are advanced for this phenomenon: (1) they are unwilling to risk exposure and hence shy away from any institutional involvement; and (2) there is no welfare tradition in Mexico to which they may have become accustomed. Conclusions about the tax contributions of illegal aliens in general are necessarily more intuitive than scientific. There is no state income tax in Texas, but it is impossible to live in a state such as Texas without paying consumer taxes, and nearly impossible to work without paying Social Security taxes. Normally, families with many children do not pay large amounts of federal income tax, regardless of the legality of their residence in the country. However, Social Security taxes are the major source of tax revenues the federal government collects from the poor in general. Preliminary Report at 162.

### Conclusions of Law

Plaintiffs urge that section 21.031, implemented by the Tyler I.S.D.'s policy of

---

**10.** The North-Houstoun Study involved the questioning of 793 apprehended illegal aliens of at least 16 years of age who had worked in the United States for wages for at least two weeks, and was designed to provide information about the characteristics of illegal aliens. The inherent bias of this study is described in the Preliminary Report at 126ff.

**11.** The conclusion that employment is the main incentive for illegal migration from Mexico has been consistently agreed upon. The undisputed testimony to this effect at trial is supported by every source this court has consulted. *See, e. g.*, Preliminary Report at 89, 152 and passim; Miller, *Immigration and National Law*, 1977 Annual Survey of American Law 205; Catz & Lenard, *The Demise of the Implied Federal Preemption Doctrine*, 4 Hastings Const.L.Q. 295 (1977).

charging undocumented children a tuition fee, denies them their right to equal protection of the laws, as guaranteed by the fourteenth amendment. Plaintiffs also argue that the challenged statute and policy should be subjected to close judicial scrutiny because: (1) plaintiffs are being absolutely deprived of any education; and (2) they are a politically powerless minority, forced to suffer because of the misdeeds of parents over whom they have no control. The fiscal justifications advanced by the Tyler I.S.D. in support of their policy, plaintiffs contend, are insufficiently compelling to justify the discrimination imposed.

Defendants counter with the argument that illegal aliens are not entitled to equal protection of the laws, but that even if they were, the challenged statute and policy are merely "state regulation in the social and economic field, not affecting freedoms guaranteed by the Bill of Rights," thereby requiring only relaxed judicial scrutiny. *Dandridge v. Williams,* 397 U.S. 471, 484, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970). Defendants also maintain that their decision to spend public funds to provide high quality education for United States citizens and lawful residents, instead of sharing it with people who have no right to be in the state at all, should be subjected to, and easily satisfies the long-established rational basis test. *See, e. g., Goesaert v. Cleary,* 335 U.S. 464, 466, 69 S.Ct. 198, 93 L.Ed. 163 (1948).

Neither the language nor the logic of the fourteenth amendment supports the proposition that the guarantee of equal protection of the laws does not extend to illegal aliens. The United States Supreme Court has indicated that illegal aliens are entitled to the protection of the due process clause. *See, e. g., Mathews v. Diaz,* 426 U.S. 67, 77, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976) (dictum); *Wong Wing v. United States,* 163 U.S. 228, 16 S.Ct. 977, 41 L.Ed. 140 (1896). The structure of section one of the fourteenth amendment does not indi-

cate a different result for the guarantee of equal protection of the laws:

> No State shall make or enforce any laws which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive *any person* of life, liberty, or property, without due process of law; nor deny to *any person within its jurisdiction* the equal protection of the laws. (Emphasis added.)

While due process is afforded to "any person," equal protection extends only to "any person within its jurisdiction." Yet this apparent narrowing of the equal protection guarantee, by virtue of its very specificity, should not be read to exclude a class of persons that fits within the narrowed language. People who have entered the United States, by whatever means, are "within its jurisdiction" in that they are within the territory of the United States and subject to its laws. Joining Judge Friendly in *Bolanos v. Kiley,* 509 F.2d 1023, 1025 (2d Cir. 1975), this court "can readily agree that the due process and equal protection clauses of the Fourteenth Amendment apply to aliens within the United States [citations omitted] and even to aliens whose presence here is illegal." *Accord, Holley v. Lavine,* 529 F.2d 1294 (2d Cir.), *cert. denied,* 426 U.S. 954, 96 S.Ct. 3181, 49 L.Ed.2d 1193 (1976); *United States v. Barbera,* 514 F.2d 294, 296 n. 3 (2d Cir. 1975). *Cf. Williams v. Williams,* 328 F.Supp. 1380 (D.V.I.1971) (illegal aliens entitled to access to divorce courts); *Martinez v. Fox Valley Bus Lines,* 17 F.Supp. 576 (N.D.Ill.1936) (illegal alien allowed to sue to recover for personal injuries in negligence action); *Commercial Standard Fire and Marine Co. v. Galindo,* 484 S.W.2d 635 (Tex. Civ.App.—El Paso 1972, writ. ref'd n. r. e.) (illegal alien not barred from workmen's compensation benefits). *But see Burrafato v. United States Department of State,* 523 F.2d 554 (2d Cir. 1975), *cert. denied,* 424 U.S. 910, 96 S.Ct. 1105, 47 L.Ed.2d 313 (1976).[12]

---

**12.** Defendants make much of the fact that the Supreme Court has never held that illegal aliens are entitled to equal protection of the laws, while it has accorded them due process, and that, in general, authority for such an inference is undeniably scarce. This dearth of authority, however, seems amply accounted for by the predictable unwillingness of illegal

■ The conclusion that illegal aliens are entitled to equal protection of the laws in no way means, however, that illegal aliens are entitled to precisely the same treatment afforded U.S. citizens and lawfully resident aliens. As Mr. Justice Jackson described the "salutary doctrine" of the equal protection clause, "cities, states and Federal Government must exercise their powers so as not to discriminate between their inhabitants except upon some reasonable differentiation fairly related to the object of regulation." *Railway Express Agency v. New York,* 336 U.S. 106, 112, 69 S.Ct. 463, 466, 93 L.Ed. 533 (1949) (concurring opinion). Viewed in this light, as a guarantee only that *unreasonable, arbitrary* lines will not be drawn, the content of the right to equal protection of the laws, not its application *vel non,* becomes the salient question, and one that must be assessed with respect to each individual case.

■ The fairness of the legislative classification contained in the challenged statute and policy must be measured within the framework of the well established two-tiered test. If the challenged law threatens a fundamental right or creates a suspect classification, the court must subject the state's interests served by the law to strict scrutiny. In such a case, the law will be upheld only if it is precisely tailored to further a compelling government interest. *Shapiro v. Thompson,* 394 U.S. 618, 638, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969). Absent a fundamental right or suspect classification, a law need only be supported by a rational basis. *San Antonio Independent School District v. Rodriguez,* 411 U.S. 1, 40, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973).[13]

As implemented by the Tyler I.S.D., section 21.031 has created a distinct class of poor, undocumented children who are absolutely deprived of any education whatsoever. While the level of scrutiny appropriate for reviewing this kind of total deprivation of education has never been explicitly identified by the Supreme Court, several elements in this case invite a close examination of section 21.031.

The first of these elements lies in the benefit denied, education. In *San Antonio Independent School District v. Rodriguez* the Court said that "[e]ducation, of course, is not among the rights afforded explicit protection under our Federal Constitution. Nor do we find any basis for saying it is implicitly so protected." 411 U.S. at 35, 93 S.Ct. at 1297. Yet the holding of *Rodriguez* was explicitly and repeatedly limited to the sort of relative deprivation of education challenged in the case itself. Under the Texas school financing scheme, children in property-poor school districts attended schools with access to fewer funds than those in property-rich school districts; but no children were prevented from attending school altogether. Indeed, the opinion is conspicuous in its efforts not to foreclose strict scrutiny in response to constitutional challenges to absolute deprivation of educational opportunity:

If elementary and secondary education were made available by the State only to those able to pay a tuition assessed against each pupil, there would be a clearly defined class of "poor" people—definable in terms of their inability to

aliens fearing deportation to expose themselves, indeed to advertise the fact of their illegality by making it the focus of a lawsuit. The cases protecting the due process rights of illegal aliens generally involve the procedural adequacy of deportation proceedings, which are already underway. *See, e. g., Wong Yang v. McCraw,* 339 U.S. 33, 70 S.Ct. 445, 94 L.Ed. 616 (1950); *Wong Wing v. United States,* 163 U.S. 228, 16 S.Ct. 977, 41 L.Ed. 140 (1896).

**13.** Commentators have suggested the emergence of a sliding scale or intermediate scrutiny, *see, e. g.,* Gunther, *The Supreme Court 1971 Term—Foreword: In Search of Evolving Doc-*

*trine on a Changing Court: A Model for a Newer Equal Protection,* 86 Harv.L.Rev. 1 (1972); and various Supreme Court decisions indicate some flexibility in the test. *See Craig v. Boren,* 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1977); *United States Dep't of Agriculture v. Moreno,* 413 U.S. 528, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973); *Eisenstadt v. Baird,* 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972). A majority of the Supreme Court, however, has never explicitly sanctioned such an approach. *But see San Antonio I.S.D. v. Rodriguez,* 411 U.S. 1, 98–110, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973) (Marshall, J., dissenting).

pay the prescribed sum—who would be absolutely precluded from receiving an education. That case would present a far more compelling set of circumstances for judicial assistance than the case before us today.

411 U.S. at 25 n. 60, 93 S.Ct. at 1292. Whatever merit appellees' argument might have if a State's financing system occasioned an absolute denial of educational opportunities to any of its children, that argument provides no basis for finding an interference with fundamental rights where only relative differences in spending levels are involved and where—as is true in the present case—no charge fairly could be made that the system fails to provide each child with an opportunity to acquire the basic minimal skills necessary for the enjoyment of the rights of speech and of full participation in the political process.

*Id.* at 37, 93 S.Ct. at 1299.[14] *See also Mills v. Board of Education,* 348 F.Supp. 866, 876 (D.D.C.1972).

An additional indication that heightened scrutiny may be appropriate arises from the contention that the challenged policy of charging tuition to undocumented children constitutes discrimination on the basis of wealth.[15] Relatively wealthy undocumented children are able to attend school despite the Tyler I.S.D. policy—two such children are actually doing so—, while poor undocumented children are excluded. In *Rodriguez,* the Court distinguished prior cases in which the class discriminated against "shared two" distinguishing characteristics: "because of their impecunity they were completely unable to pay for some desired benefit, and as a consequence, they sustained an absolute deprivation of a meaningful opportunity to enjoy that benefit." 411 U.S. at 20, 93 S.Ct. at 1290. Such absolute deprivations imposed only on poor people have long been considered deserving of judicial solicitude, *see, e. g., Griffin v. Illinois,* 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1958), and such a tuition requirement was explicitly distinguished in *Rodriguez* when the Court declared that the existence of "a clearly defined class of 'poor' people" would "present a far more compelling set of circumstances for judicial assistance" than the San Antonio case itself. 411 U.S. at 25 n. 60, 93 S.Ct. at 1292. Similarly, in *Shapiro v. Thompson,* 394 U.S. at 633, 89 S.Ct. at 1330, the Court observed that a state "could not, for example, reduce expenditures for

---

**14.** It is no answer to the *Rodriguez* dictum that the ability of illegal alien children to exercise free speech and participate in the political process is of no concern to the State of Texas. These children, and many more like them, are here and are likely to remain here. (See Findings of Fact, *supra.*) The federal government has chosen, whether by act or omission, not to deport them. Many of them have younger siblings who are American citizens and who may someday be the means of legalizing the presence of the whole family. Developments in federal immigration policy, such as President Carter's proposed amnesty plan, may legalize their status at a much earlier date. As the Supreme Court has recognized, the benefits of education are not reserved to those whose productive utilization of them is a certainty: "[a]lthough an alien may be barred from full involvement in the political arena, he may play a role—perhaps even a leadership role in other areas of import to the community." *Nyquist v. Mauclet,* 432 U.S. 1, 12, 97 S.Ct. 2120, 2127, 53 L.Ed.2d 63 (1977).

**15.** It is not completely clear whether the statute itself, as opposed to the Tyler policy, contemplates admitting undocumented children to public schools upon payment of tuition. Subsection (a) of § 21.031 clearly excludes them from the benefits of the Available School Fund, which means the school they attend could not legally draw state funds for them. Subsection (b) of the statute appears to permit only citizens or legally admitted aliens to attend the public schools at all. Subsection (c) of § 21.-031, however, directs the local boards of trustees to admit citizens and legally admitted aliens into the public schools *free of tuition,* which might imply that undocumented children might be admitted on the payment of tuition. The only two school districts which, to the court's knowledge, have made a policy of implementing § 21.031, Houston I.S.D. and Tyler I.S.D., have read the statute to permit enrollment of undocumented children who pay tuition, and counsel for the state appears to have made the same assumption. The state's focus on financial restrictions as the major justification for its law supports the conclusion that the statute contemplates admitting undocumented children who pay tuition.

education by barring indigent children from its schools."

Furthermore, although it is not inaccurate to characterize section 21.031 as "state regulation in the social and economic field," *Dandridge v. Williams,* 397 U.S. at 484, 90 S.Ct. at 1161, as defendants urge, this case does not follow the pattern of those in which such a characterization has triggered relaxed rather than heightened review. In *Dandridge,* as in *Rodriguez,* the deprivation was relative rather than absolute, *i. e.,* some families received less aid in proportion to the number of children than others, but no discrete class of needy families was completely cut off from benefits. *See also Jefferson v. Hackney,* 406 U.S. 535, 92 S.Ct. 1724, 32 L.Ed.2d 285 (1972).

A more exacting scrutiny of the Texas law also appears warranted when consideration is given to the decisions of the Supreme Court refusing to penalize and stigmatize children who are not in a position to prevent the wrongful acts of their parents. As Mr. Justice Powell said of laws disfavoring illegitimate children:

> [V]isiting this condemnation on the head of an infant is illogical and unjust. Moreover, imposing disabilities on the . . . child is contrary to the basic concept of our system that legal burdens should bear some relationship to individual responsibility or wrongdoing.

*Weber v. Aetna Casualty and Surety Company,* 406 U.S. 164, 175, 92 S.Ct. 1400, 1406, 31 L.Ed.2d 768 (1972) (footnote omitted). *See also St. Ann v. Palisi,* 495 F.2d 423, 425 (5th Cir. 1974) (invalidating school board's decision to suspend two children from school because their mother had assaulted an assistant principal, on ground that "[f]reedom from punishment in the absence of *personal* guilt is a fundamental concept in the American scheme of justice."). While the undocumented minor plaintiffs are of course legally culpable and subject to deportation,[16] they can hardly be held mor-

ally responsible for their presence here. Many of them were hardly more than infants when they arrived in the United States, nor did they participate in their parents' decision to emigrate; consequently they deserve no additional burdens or penalties.

Finally, plaintiffs, together with the United States as *amicus curiae,* urge that strict scrutiny should be applied because illegal aliens are basically a suspect class. Illegal aliens as a class, they urge, meet all the "traditional indicia of suspectness," in that,

> [t]he class is . . . saddled with such disabilities, or subjected to such a history of purposeful unequal treatment, or relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process.

411 U.S. at 28, 93 S.Ct. at 1294.

Plaintiffs and *amicus* further maintain that illegal aliens are a suspect class because they are a sub-class of a suspect class, that is, of aliens in general. *Nyquist v. Mauclet,* 432 U.S. 1, 97 S.Ct. 2120, 53 L.Ed.2d 63 (1977). However, it is clear that illegal aliens are not a sub-class of the class of aliens granted suspect status in *Graham v. Richardson,* 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971), and its progeny, for the Supreme Court in *Graham* referred specifically to the class of lawfully admitted aliens. Illegal aliens are, therefore, not a sub-class but rather a separate class, for which suspect status must be independently established.

The State of Texas makes the provocative argument that it is the implicit holding of *DeCanas v. Bica,* 424 U.S. 351, 96 S.Ct. 933, 47 L.Ed.2d 43 (1976), that illegal aliens are not a suspect class. At issue in *DeCanas* was a California statute (Cal.Lab.Code § 2805(a)) prohibiting the knowing employment of illegal aliens when lawfully resident workers would be disadvantaged.[17]

---

16. 8 U.S.C.A. §§ 1325 and 1326, making illegal entry a misdemeanor for the first commission and a felony for subsequent commissions, and

making reentry of a deported alien a felony, do not distinguish between children and adults.

17. The statute provides, in pertinent part:

The Supreme Court held that the law was not unconstitutional as a regulation of immigration, *see infra* at 590. The State of Texas contends that the California law disfavors illegal aliens and would necessarily have fallen under an equal protection analysis if illegal aliens had been regarded as a suspect class.

While the *DeCanas* opinion makes no mention of the equal protection clause, the case was, in the abstract at least, susceptible to equal protection analysis. It does not appear, however, that any of the parties in *DeCanas* had standing to raise the equal protection question. Employers of illegal aliens were defendants in a suit brought by displaced *legal* alien workers to enforce the California law; it was the defendant employers who raised the federal preemption argument as a defense. Nevertheless, even if *DeCanas* had been upheld squarely against an equal protection challenge, this court feels that the case is substantially distinguishable on both the general question of the constitutionality of section 21.031 and the particular question of whether illegal aliens are a suspect class, *see infra*.

It seems clear that illegal aliens do not constitute a suspect class when they are in violation of state laws or regulations whose underlying purpose is in conformity with a federal objective or end. The issue of their suspectness as a class is raised, however, by the uncontroverted history of their abuse and exploitation in certain conditions and circumstances unrelated to the federal bases for their exclusion. A reconciliation of this conflict might be accomplished by recognizing illegal aliens as a suspect class—and requiring strict scrutiny—in situations where the state acts independently of the federal exclusionary purposes, accepts the presence of illegal aliens, and then subjects them to discriminatory laws. The law in *DeCanas* and section 21.031 clearly part company under this analysis, as an inquiry into the purposes and effect of federal law reveals.

The cornerstone of federal immigration law remains the Immigration and Nationality Act of 1952, also known as the McCarran-Walter Act, 8 U.S.C. §§ 1101 *et seq.* Insofar as the instant case is concerned, the most salient features of the Act are: limitation of immigration into the United States; exclusion of those aliens who are not granted visas; and assignment of criminality to foreigners who enter without permission. The McCarran-Walter Act identifies two main principles according to which the admission of prospective immigrants must be defined. First, the Act evidences a strong concern for family reunification, making a relationship with a United States citizen or permanent resident the primary means of obtaining a visa. Second, the Act contains a labor certification program "designed to protect the United States labor market from the influx of both skilled and unskilled foreign labor." Note, *Alien Labor Certification Proceedings: The Personal Preference Doctrine and the Burden of Persuasion,* 43 Geo.Wash.L.Rev. 914 (1975).

Section 212(a)(14) of the McCarran-Walter Act originally placed the burden of certification on the Secretary of Labor. Aliens were not ineligible for admission until the Secretary so certified.[18] In 1965, partly in

---

(a) No employer shall knowingly employ an alien who is not entitled to lawful residence in the United States if such employment would have an adverse effect on lawful resident workers.

18. Section 212(a)(14) of the McCarran-Walter Act provided, in pertinent part:

(a) Except as otherwise provided in this Act, the following classes of aliens shall be ineligible to receive visas and shall be excluded from admission into the United States:

\* \* \* \* \* \*

(14) Aliens seeking to enter the United States for the purpose of performing skilled or unskilled labor, if the Secretary of Labor has determined and certified to the Secretary of State and to the Attorney General that (A) sufficient workers in the United States who are able, willing, and qualified are available at the time (of application for a visa and for admission into the United States) and place (to which the alien is destined) to perform such skilled or unskilled labor, or (B) the employment of such aliens will adversely affect the wages and working conditions of workers in the United States similarly employed.

response to requests from organized labor, *see* Note, 43 Geo.Wash.L.Rev. at 915 n. 9, Congress amended the provision to strengthen its protection of the domestic labor force. As amended, the labor certification program excludes an alien worker [19] *unless* the Secretary of Labor makes certain determinations. Specifically, the section provides:

(a) Except as otherwise provided in this chapter, the following classes of aliens shall be ineligible to receive visas and shall be excluded from admission into the United States:

\* \* \* \* \* \*

(14) Aliens seeking to enter the United States, for the purpose of performing skilled or unskilled labor, unless the Secretary of Labor has determined and certified to the Secretary of State and to the Attorney General that (A) there are not sufficient workers in the United States who are able, willing, qualified, and available at the time of application for a visa and admission to the United States and at the place to which the alien is destined to perform such skilled or unskilled labor, and (B) the employment of such aliens will not adversely affect the wages and working conditions of the workers in the United States similarly employed. The exclusion of aliens under this paragraph shall apply to special immigrants defined in section 1101(a)(27)(A) of this title (other than the parents, spouses, or children of citizens or of aliens lawfully admitted to the United States for permanent residence), to preference immigrant aliens described in sections 1153(a)(3) and 1153(a)(6) of this title, and to non-preference immigrant aliens described in section 1153(a)(8) of this title . . .

8 U.S.C. § 1182(a)(14) (1970).

Since illegal aliens come to the United States to find employment, it is reasonable to assume that they would not emigrate if they did not expect to find employment. The prohibition of employment of illegal aliens is an important feature of major federal proposals to upgrade the effectiveness of congressional limits on immigration, indicating a consensus of opinion that such measures are effective. *See also* Preliminary Report at 241. The Supreme Court has repeatedly recognized the same phenomenon: "The assertion of an authority to deny to aliens the opportunity of earning a livelihood when lawfully admitted to the State would be tantamount to the assertion of the right to deny them entrance and abode, for in ordinary cases they cannot live where they cannot work." *Takahashi v. Fish & Game Commission*, 334 U.S. 410, 416, 68 S.Ct. 1138, 1140, 92 L.Ed. 1478 (1948), quoting *Truax v. Raich*, 239 U.S. 33, 42, 36 S.Ct. 7, 60 L.Ed. 131 (1915).

A state law prohibiting employment of illegal aliens may be entirely consistent with the federal scheme. The improved federal labor certification program was enacted, in the words of its proponents, to "protect . . . the American economy and the wages and working conditions of American labor." 111 Cong.Rec. 24463 (1965) *quoted in* Note, *Alien Labor Certification*, 60 Minn.L.Rev. 1034, 1034 n. 3 (1975). The California legislature's prohibition of the knowing employment of illegal aliens manifestly represents a local effort to deal with a particularly aggravated version of the dangers Congress has recognized and made one of its central concerns. Thus, although the *DeCanas* Court did not base its decision on this point, the state scheme, perhaps unwittingly, serves the basic purposes of the Immigration and Nationality Act, for section 2805(a) promotes not only the specific federal design of protecting the domestic labor market, but also the general function of exclusion.

By contrast, the Texas statute at issue in the instant case is neither intended to, nor does it in fact, implement any express or apparent federal objective. The state does not attempt to justify section 21.031 as an effort to exclude or to discourage those

19. Not all aliens are subject to § 212(a)(14). The exclusions from its provision, which derive from the priority Congress has placed on certain family relationships, are specified in the last part of the section.

aliens whom Congress has chosen to exclude, nor could such a justification be taken seriously. Charging tuition to undocumented children constitutes a ludicrously ineffectual attempt to stem the tide of illegal immigration, when compared with the California statute [20] or the proposed federal equivalents. While the Texas legislature is in no way obligated to prohibit the employment of illegal aliens, its failure to do so is glaring and undermines any earnest attempt to argue an exclusionary motivation.[21]

In short, by its own admissions and the logic of its legislative scheme, the State of Texas has been content to leave to the federal government the task of excluding illegal immigrants and thus protecting the domestic labor market.[22] This virtually ensures what is undisputably the case in Texas: the existence of a large number of employed illegal aliens, such as the parents of plaintiffs in this case, whose presence is tolerated, whose employment is perhaps even welcomed, but who are virtually defenseless against any abuse, exploitation, or callous neglect to which the state or the state's natural citizens and business organizations may wish to subject them. In such a context, the state's exclusion of undocumented children from its public schools, or, alternatively, its attempts to exact from such children a much larger sum of money than is in fact required to absorb them into an ongoing school system, may well be the type of invidiously motivated state action for which the suspect classification doctrine was designed. In the instant civil action, however, none of four indications that strict scrutiny is the appropriate level of review, as discussed above, exactly corresponds with any case in which the Supreme Court has applied such scrutiny. In any case, since it appears that defendants have not demonstrated a rational basis for the state law or the local school policy, it is not necessary to resolve finally the difficult conceptual problems posed by the two-tiered test.

Defendants seek to justify section 21.031 by arguing that, in view of the limited revenues available within the state which can be used to achieve the social goal of educating Texas children, "[t]he legislature has determined that those funds are to be used to educate the United States' citizens and the legally admitted aliens who reside in Texas." Brief of Defendant Tyler I.S.D. at 16.[23] Defendants attempted by their proof at trial to rationalize this decision by cataloguing a number of characteristics and special educational needs that make illegal alien children especially burdensome to educate. Notwithstanding, careful consideration of the evidence and applicable law compels the conclusion that neither of these approaches provides a rational basis for the

**20.** It is also interesting to compare another California law mentioned by the United States in its Post-trial Brief, under which the state reimburses a local district for the cost of educating an undocumented child, but requires local officials to forward a list of names of such children to the I.N.S. The court expresses no opinion as to the constitutionality of such a law, but mentions it only as a more effective way of discouraging illegal immigration through the public schools than charging tuition.

**21.** Bills prohibiting the employment of illegal aliens under various circumstances were introduced during the 1977 session of the Texas legislature, but none was reported out of committee. *See, e. g.,* House Bills 174, 374 and 816.

**22.** There are two sides to the effect of illegal workers on a local labor market, and it is simply a question of political and economic preference whether the net effect is found to be good or bad. According to the Preliminary Report, and stated very simplistically, both illegal and legal immigration of workers increases the gross national product. If illegal workers can be hired at lower wages and in worse working conditions, profits rise and prices fall, resulting in small economic gains for many people. The argument against this view, of course, considers the displacement of low-income lawfully resident workers and the dangers of an exploitative employment relationship. *See* Preliminary Report at 155ff. The federal government and California prefer to protect lawfully resident workers from displacement.

**23.** An identical statement is found in the state's Brief in Opposition to Application for Writ of Error submitted to the Supreme Court in *Hernandez, supra,* at 9.

state's singling out of undocumented children to bear the brunt of whatever financial problems the Texas public schools may have.

■ It is not sufficient justification that a law saves money. This approach to the rationality test is well illustrated in the case of *United States Department of Agriculture v. Moreno,* 413 U.S. 528, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973), in which the Supreme Court struck down as irrational section 3(e) of the Food Stamp Act of 1964, which excluded from participation in the food stamp program any household containing an individual unrelated to any other member of the household. Clearly this exclusion would have saved the federal government money; a program affording benefits to all households costs more than a program affording benefits only to some. Despite this factor, the saving to the Government was not considered by the Court as a sufficient justification, absent some rational connection between the purposes of the Act and the group excluded. Emphasizing the purpose of the Food Stamp Act—the stimulation of the agricultural economy by the purchasing of farm surpluses—, the Court held that the relationships among persons in a household were irrelevant to that purpose and did not provide a rational principle of exclusion. The legislative history of section 3(e) revealed that the provision "was intended to prevent so-called 'hippies' and 'hippie communes' from participating in the food stamp program." 413 U.S. at 534, 93 S.Ct. at 2826. Apparently, Congress chose not to subsidize living arrangements and lifestyles of a certain variety. But, "if the constitutional conception of 'equal protection of the laws' means anything, it must at the very

least mean that a bare congressional desire to harm [24] a politically unpopular group cannot constitute a *legitimate* governmental interest." *Id.*[25]

The state's first line of defense for its distinction between legal and illegal residents can be restated both in substance and tone, as "it goes without saying." In its own words, "the legislature has determined that [educational] funds are to be used to educate the United States' citizens and the legally admitted aliens who reside in Texas." Brief of Defendant Tyler I.S.D. at 16. This, however, does not demonstrate a rational basis; it is merely a reaffirmation of the law itself. The Supreme Court recently rejected a similarly "rational" basis as a mere "assertion that discrimination may be justified by a desire to discriminate". *Examining Board v. Otero,* 426 U.S. 572, 605, 96 S.Ct. 2264, 2283, 49 L.Ed.2d 65 (1976).

Nor does the state's adoption of a federal criterion, in this case the illegality of a child's presence in the United States, in itself, provide a rational justification for differential treatment by the state. Mr. Justice Murphy explained this fallacy in his concurring opinion in *Oyama v. California,* 332 U.S. 633, 68 S.Ct. 269, 92 L.Ed. 249 (1948). Assuming that Congress had made a reasonable classification in exercise of its authority to regulate immigration,

[y]et it does not follow . . . that California can blindly adopt those distinctions for the purpose of determining who may own and enjoy agricultural land. *What may be reasonable and constitutional for Congress for one purpose may not be reasonable or constitutional for a state legislature for another and wholly*

---

**24.** It must be remembered that the "harm" referred to in *Moreno* was denial of benefits, exactly as in the instant case, rather than active persecution.

**25.** It is certainly true, as the state contends, that in many cases concerning "state regulation in the social and economic field," the Supreme Court has deferred to state decisions concerning allocation of resources, without probing too deeply. *See, e. g., Dandridge v. Williams,* 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970); *San Antonio I. S. D. v.*

*Rodriguez,* 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973). However, these cases involved relative rather than absolute deprivations. When a legislature excludes a group entirely, whether or not that group is a suspect class, the Court has focused somewhat more sharply on the state's rationale for the exclusion, requiring a *legitimate* purpose that is, in fact, furthered by the classification. *See San Antonio I. S. D. v. Rodriguez,* 411 U.S. at 59, 93 S.Ct. 1278 (Stewart, J., concurring).

*distinct purpose. . . .* In other words, if a state wishes to borrow a federal classification, it must seek to rationalize the adopted distinction in the new setting. *Is the distinction a reasonable one for the purposes for which the state desires to use it?* To that question it is no answer that the distinction was taken from a federal statute . . . .

332 U.S. at 664–65, 68 S.Ct. at 284 (emphasis added).

Because of the crucial distinction between federal and state power in the immigration area, defendants' reliance on *Mathews v. Diaz,* 426 U.S. 67, 80, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976), to justify their use of plaintiffs' illegal immigration status as a principle of exclusion, is wholly misplaced. In *Mathews,* the Court upheld a congressional decision to condition an alien's eligibility for federal medical insurance upon continuous residence in the United States and admission for permanent residence. In so holding, the Court noted that "[n]either the overnight visitor, the unfriendly agent of a hostile foreign power, the resident diplomat, nor the illegal entrant, can advance even a colorable constitutional claim to a share in the bounty that a conscientious sovereign makes available to its own citizens and *some* of its guests." 426 U.S. at 80, 96 S.Ct. at 1891. The opinion makes clear, however, that while distinctions in immigration status are legitimate bases for federal classifications, they are normally of no concern to the states.

Insofar as state welfare policy is concerned, there is little, if any, basis for treating persons who are citizens of another State differently from persons who are citizens of another country. Both groups are noncitizens as far as the State's interests in administering its welfare programs are concerned. Thus, a division by a State of the category of persons who are not citizens of that State into subcategories of United States citizens and aliens has no apparent justification, whereas, a comparable classification

by the Federal Government is a routine and normally legitimate part of its business.

*Id.* at 85, 96 S.Ct. at 1894 (footnote omitted). Subsequently, the Court reaffirmed the inappropriateness of state importation of immigration criteria, by holding that the State of New York "can draw no solace from [*Mathews v. Diaz, supra* ], however, because the Court was at pains to emphasize that Congress, as an aspect of its broad power over immigration and naturalization, enjoys rights to distinguish among aliens that are not shared by the States." *Nyquist v. Mauclet,* 432 U.S. 1, 7 n. 8, 97 S.Ct. 2120, 2124, 53 L.Ed.2d 63 (1977).

The question for determination in this case is, therefore, the one posed by Mr. Justice Murphy in *Oyama* : Is the federal distinction a reasonable one for the purposes for which the state desires to use it? Two main categories of state interests in discriminating against illegal aliens might satisfy this requirement. The first category is state interests which are concurrent with the federal interests for which the distinction was originally drawn. The second category includes state attempts to deal with problems generated by an alien's illegal status, rather than merely with his presence. The California law upheld in *DeCanas* falls within and illustrates both categories, while the Texas statute challenged here belongs to neither.

The rationality of California's section 2805(a) is clearly revealed by the Supreme Court's statement that "the State is not inhibited from making the national purposes its own purposes to the extent of exerting its police power to prevent its own citizens from obstructing the accomplishment of such purposes." *Gilbert v. Minnesota,* 254 U.S. 325, 41 S.Ct. 125, 65 L.Ed. 287 (1920). Had section 2805(a) been subjected to an equal protection challenge, it might easily have been upheld as a means of preventing California citizens from encouraging illegal immigration, *i. e.,* obstructing federal law by employing illegal entrants,[26]

**26.** The holding of *Gilbert* concerning the first amendment issue raised in that case may no longer be good law. However, this court has

found nothing in the Supreme Court's later preemption decisions which overrides the quoted language.

or as a local measure dealing with congressionally-recognized problems of local labor.

In the second category of rational state interests mentioned above, the class of illegal workers disfavored by section 2805(a) is clearly distinguishable from the class of lawfully resident workers, by virtue of their very illegality. The Supreme Court in *De-Canas* recognized that infiltration of illegal aliens into a labor market has marked effects on that market: "acceptance by illegal aliens of jobs on substandard terms as to wages and working conditions can seriously depress wage scales and working conditions of citizens and legally admitted aliens; and employment of illegal aliens under such conditions can diminish the effectiveness of labor unions." 424 U.S. at 356–57, 96 S.Ct. at 937. The threat to labor standards posed by employment of illegal aliens is universally acknowledged. *See* sources cited *supra* at n. 10. Illegal immigrants, by virtue of their covert status and fear of exposure, cannot invoke state and federal laws enacted to improve conditions of employment. The nexus between violation of the immigration laws and the resultant adverse effects on a local economy is clear and well documented. Illegal aliens "live under the constant fear of detection and deportation, and are thus easily exploited by employers looking for persons to work at low wages and under poor conditions." Miller, *Immigration and National Law,* 1977 Annual Survey of American Law 205, 228.

In summary, California's decision to require that employers give preference to lawful residents over illegal entrants is rational for two reasons. First, it borrows the federal criterion in order to deal with the same problems, on a local level, for which, on a national scale, the federal law was enacted. Second, the distinction drawn in section 2805(a) is rational because characteristics peculiar to illegal workers are central to the threat to labor standards which the law addresses. In contrast, Texas' section 21.031 does not purport to serve any federal purposes. Neither has the state articulated the discrete considerations relating to the status of the class excluded by section 21.031 that make it reasonable for the state to refuse to educate its members. On the contrary, all of the arguments advanced by the state to justify its decision to exclude illegal aliens, as opposed to any other group, are either underinclusive or overinclusive, so as to belie any truly rational connection between the ends sought and the means employed.

The state has not explicitly argued that illegal aliens are distinguishable because they pay lower or no taxes, nor would such an argument have merit. While not conclusive, the preponderance of the evidence indicates that illegal aliens do pay taxes. The major source of the state's educational expenditures is consumer taxes, which *no* resident of the state, whatever his citizenship or immigration status, can avoid paying. The evidence was to the effect that anyone who rents housing indirectly contributes to the property tax, which accounts for most local educational contributions. Thus, illegal aliens contribute to these public funds on an equal basis with all other residents of the United States. This does not mean, of course, that all residents pay identical amounts of taxes; rather, that illegal aliens are subject to the same taxes as other residents of similar means. As has been mentioned earlier in this opinion, poor families in general pay little income tax. In the context of this case, this is of negligible significance, however; the State of Texas has no income tax, and the federal government collects its major contribution from the poor by way of Social Security taxes, which illegal workers cannot easily avoid paying. Preliminary Report at 162. It has never been suggested that, simply because his parents are poor and pay comparatively small amounts in taxes, the state is permitted to limit a resident child's access to public education. *See Shapiro v. Thompson,* 394 U.S. 618, 633, 89 S.Ct. 1322, 1330, 22 L.Ed.2d 600 (1969) (a state "could not, for example, reduce expenditures for education by barring indigent children from its schools"). As the Supreme Court has recog-

nized in analogous situations, "the 'justification of limiting expenses is particularly inappropriate and unreasonable when the discriminated class consists of aliens. Aliens like citizens pay taxes . . . ' [citations omitted]. There can be no 'special public interest' in tax revenues to which aliens have contributed on an equal basis with the residents of the State." *Graham v. Richardson,* 403 U.S. 365, 376, 91 S.Ct. 1848, 1854, 29 L.Ed.2d 534 (1971).

As the findings of fact show,[27] in this case the bulk of defendants' evidence was directed at proving what none tried to dispute, that Mexican emigration into the United States has caused grave overcrowding in the border school districts, which has been compounded by the poverty of the parents of the Mexican children and their special needs (bilingual education, free lunch, free breakfast, and free clothing). Excluding illegal immigrant children because of these problems is both irrational, because the undocumented children as a class are basically indistinguishable from the legally resident alien children in terms of their needs,[28] and ineffectual, because the dominant problem remains unsolved. Viewed in light of the state's own statement of the issue with which section 21.031 attempts to deal, the irrationality of its choice of means is clearly revealed. An influx of poor, Spanish-speaking children, especially in the school districts adjacent to Mexico, has occasioned the hardships complained of by defendants. Most of these children are legally present in the United States. If exclusion of certain resident children from the school system is chosen as the method of dealing with inadequate educational facilities, the rational approach is to exclude all such problem children regardless of whether they are legal or illegal residents. It would be easy to define the precise limits of such a group, using the various "problem criteria" such as parental wealth, English-speaking ability, age relative to assigned grade, degree of educability, and the other characteristics the state has urged in this lawsuit as a justification for exclusion. A category of all non-English speaking children whose parents own property valued at less than a given amount would probably take care of the situation nicely, in that it would effectively exclude Mexican immigrants.

The obvious unconstitutionality of such a statutory classification presents an insurmountable obstacle to its enactment into law. Nevertheless, bent on cutting educational costs and unable constitutionally to exclude all such "problem" children, the state has attempted to shave off a little around the edges, barring the undocumented alien children despite the fact that they are no different for educational purposes from a large proportion of legally resident alien children. The expediency of the state's policy may have been influenced by two actualities: children of illegal aliens had never been explicitly afforded any judicial protection, and little political uproar was likely to be raised in their behalf.

Apart from the arbitrary nature of the state policy, such a marginal approach to a major social problem is strikingly ineffectual. This court notes with irony that any spectator watching the state's presentation of evidence might easily have mistaken it for a retrial of the *Rodriguez* case, with the State of Texas acting as *amicus curiae* for plaintiffs, emphasizing the plight of the property-poor border school districts under the state's educational financing scheme. While upholding the state's scheme of financing public education as constitutional in *Rodriguez,* the Supreme Court never expressed the view that it was perfect, or even wise. Rather, the Court went only so

---

27. *See supra* at 575–576.

28. In addition to being shared by legal Mexican immigrant children, the "special needs" of undocumented children which the state claims makes them so burdensome to educate are largely financed by federal funds. The free lunch, breakfast, and clothing are federally sub- sidized programs in their entirety, while almost half of the cost of bilingual education in Texas is also paid for by the federal government. None of these programs limits funds to documented children. This further undermines the plausibility of the state's decision to save money by excluding these children.

far as to recognize that the system "was implemented in an effort to *extend* public education and to improve its quality," 411 U.S. at 39, 93 S.Ct. at 1300, and that it "assur[ed] a basic education for every child in the State," *id.* at 49, 93 S.Ct. at 1305. Consequently, the state's policy was not subjected to close judicial scrutiny.

Texas' present method of financing public education by relying heavily upon the property wealth within a school district has apparently begun to strain at the seams. The state, as well as the children attending threadbare schools, now finds the contemporary policy insupportable. This court expresses no opinion as to how the State of Texas might readjust its public school financing scheme in order to respond to the stark inequalities of educational opportunity between children in the border and metropolitan school districts and children in districts such as the Tyler I.S.D., where the impact of immigration is admittedly negligible. The court can, however, invalidate state efforts that fail to demonstrate a rational basis and that make scapegoats of a defenseless group, chosen in an arbitrary, or even invidious manner.

Finally, it is necessary to address the question of whether the statute and policy challenged here have infringed upon an area that is preempted by federal law. In *DeCanas v. Bica, supra,* the Supreme Court considered the preemption argument on three levels. First, the Court declared that although the federal government's exclusive power in the area of immigration is well established, not every state enactment dealing with aliens is preempted as a regulation of immigration. 424 U.S. at 355, 96 S.Ct. 933. Characterizing section 2805(a) of the California Labor Code [29] as an essentially local effort on the part of the state to "strengthen its economy," the *DeCanas* Court held that the Constitution did not require preemption of such state regulation as "an invalid state incursion on federal power." 424 U.S. at 355–56, 96 S.Ct. at 936.

Next, the *DeCanas* Court considered whether Congress, in enacting the Immi-

gration and Nationality Act, had clearly intended a complete ouster of state regulatory power over the employment of illegal aliens. Such a "manifestation of congressional intent to 'occupy the field,'" *id.* at 357 n. 5, 96 S.Ct. at 937, or "to preclude even harmonious state regulation touching on aliens in general or the employment of illegal aliens in particular," *id.* at 358, 96 S.Ct. at 937, would have required invalidation of the state law under the supremacy clause. The Court found that preemption was not compelled on this basis.

The final inquiry in *DeCanas* focused on whether the California statute burdened or conflicted with any federal laws or treaties. Again, in such a case, the supremacy clause requires preemption "to the extent necessary to protect the achievement of the aims of" the federal legislation, *id.* at 358 n. 5, 96 S.Ct. at 937, quoting *Merrill Lynch, Pierce, Fenner & Smith v. Ware,* 414 U.S. 117, 127, 94 S.Ct. 383, 38 L.Ed.2d 348 (1973). *DeCanas* was remanded for a determination of whether the statute presented any "obstacle to the accomplishment and execution of the full purposes and objectives of Congress," 424 U.S. at 363, 96 S.Ct. at 940, quoting *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 85 L.Ed. 581 (1941).

The *DeCanas* Court apparently found that the California labor statute mirrored the federal government's concern with protection of the domestic labor market. *See* 424 U.S. at 363, 96 S.Ct. 933. Depending upon how it is construed by the state courts, the statute may withstand the preemption challenge. In sharp contrast, the Texas statute at issue in the instant case is inconsistent with the federal scheme and "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," 312 U.S. at 67, 61 S.Ct. at 404, as expressed not only in the Immigration and Nationality Act but also in federal laws relating to funding and discrimination in education. Thus, under the third preemption principle enunciated in *DeCanas,* section 21.031 must fall.

**29.** *See* note 17 *supra.*

The questions of section 21.031's consistency with congressional intent and of its validity under the equal protection clause are intimately related. Congressional sensitivity to the constitutional rights of those it regulates is traditionally assumed by courts in assessing congressional intent. *Id.* at 74, 61 S.Ct. at 407–408; *Kent v. Dulles,* 357 U.S. 116, 129, 78 S.Ct. 1113, 2 L.Ed.2d 1204 (1958). As already set out, the subcategory of illegal aliens affected by section 21.031 consists of more or less settled families, who have established deeper roots in this country than the much more typical single temporary illegal worker. The plaintiff families in this suit, for example, have lived in Tyler for years and are likely to remain unless deported. The state has accepted their taxes and its citizens have profited by, perhaps even exploited, their labor. Regardless of the doctrinal language chosen, the fundamental issue is what burdens the state may impose on established residents who are in violation of federal immigration laws.

In its exclusive authority to regulate immigration, Congress has chosen to limit the number of aliens who may emigrate into the United States each year. The preference system now in effect reveals two primary principles of selection: family unification and protection of the domestic labor market. The testimony and exhibits in this case reveal that federal enforcement efforts follow two major patterns. The most massive strategy is to prevent illegal migration at the border; forty percent of I.N.S. resources are devoted to the area of initial entry. Preliminary Report at 76. Further into the interior, detection and enforcement efforts are primarily geared toward places of employment. Once an illegal entrant is detected, he is either criminally prosecuted, deported, or told to leave voluntarily. The last procedure is the most widely used, since the I.N.S. has insufficient resources to institute formal proceedings against the overwhelming numbers of those detected.

While California's labor law may fit harmoniously into this framework of federal purpose and priorities, section 21.031 of the Texas Education Code is irreconcilable with the federal scheme. The California statute penalizes *employers* for not abiding by the employability criteria already established by Congress; there is no indication that Congress in any way intended to impose on *illegal entrants* the kind of penalty devised by defendants here. On the contrary, the federal scheme bespeaks the intent to deal with the problem of illegal aliens at the source, or as close to the source as possible; this approach is generally conceded to be the most humane, *see, e. g.,* Preliminary Report at 96. The federal government's method is to turn the illegal alien back at the border and destroy his main incentive for coming, rather than to let him enter and establish roots, and then treat him as if he were a second-class citizen.

Furthermore, federal laws consistently demonstrate a strong congressional commitment to education, in particular the education of disadvantaged children. For example, 20 U.S.C. § 241a announces the following declaration of policy:

> In recognition of the special educational needs of children of low-income families and the impact that concentrations of low-income families have on the ability of local education agencies to support adequate educational programs, the Congress hereby declares it to be the policy of the United States to provide financial assistance (as set forth in the following parts of this subchapter) to local educational agencies serving areas with concentrations of children from low-income families to expand and improve their educational programs by various means (including *preschool programs*) which contribute particularly to meeting the special educational needs of educationally deprived children.

Nothing in the statute distinguishes between documented and undocumented children. *See* 20 U.S.C. § 241c. Moreover, federal law prohibits denial of educational opportunity to non-English speaking children through failure to provide bilingual education. 20 U.S.C. § 1703; *Lau v. Nichols,* 414 U.S. 563, 94 S.Ct. 786, 39 L.Ed.2d 1 (1974).

The federal government's commitment to expanding educational opportunity is also evidenced in the Protocol of Buenos Aires, cited by plaintiffs in their trial brief:

The member states will exert the greatest efforts, *in accordance with their constitutional processes,* to ensure the effective exercise of the right of education on the following basis:

(a) Elementary education compulsory for children of school age, shall also be offered to all others who can benefit from it. When provided by the State it shall be without charge. (Emphasis added.)

*See* 21 U.S.T. 607, T.I.A.S. No. 6847 (1970).

 While none of these federal laws or policies precisely and expressly prohibits the state conduct complained of in this case, that is not dispositive of the preemption challenge, "[f]or when the question is whether a Federal act overrides a state law, the entire scheme of the statute must, of course, be considered, and that which needs must be implied is of no less force than that which is expressed." *Savage v. Jones,* 225 U.S. 501, 533, 32 S.Ct. 715, 726, 56 L.Ed. 1182 (1912). The Texas statute challenged here defeats the clear implications of federal laws covering both illegal aliens and education of disadvantaged children.

In summary, federal law is geared toward the exclusion of illegal aliens. Illegal entry is a misdemeanor, punishable upon first commission by not more than six months imprisonment or $500 fine, or both; subsequent commissions are felonies. 8 U.S.C. § 1325. However, criminal prosecutions are infrequently undertaken, and the primary enforcement tool is voluntary departure, Preliminary Report at 81–82. This simply restores the status quo, as if the entrant had never arrived. Because of the congruency of employment and presence in the United States, that is, the absence of any motivation to stay if employment is unavailable, the I.N.S. strategy of detecting illegal entrants at their place of employment has, albeit indirectly, the same basic purpose and effect as deportation. The federal government appears to have little interest in employing punitive measures other than as a deterrent in service of its major purpose of exclusion.

Nothing in the Immigration and Nationality Act indicates that additional burdens on illegal immigrants are to be imposed at the whim of the various states. Furthermore, federal laws dealing with education render denial of education to undocumented children among the additional penalties Congress would be least likely to tolerate. Certainly two of the reasons for congressional concern with education of poor, non-English speaking children are the conviction that merit is as likely to be found and developed in such children as in any others, as long as they are given a chance; and the tremendous disadvantages suffered by children who grow up uneducated in a modern society. The undisputed testimony at trial indicated that if these already disadvantaged children are denied an education when they are young, they will be forever relegated to the lowest level of employment. If the state refuses to educate them now, even a future grant of amnesty by Congress will not prevent many of these children from having been permanently stigmatized and crippled by their former illegal status. By virtue of its irreparability, this is a particularly harsh—perhaps even cruel and unusual—penalty for the state to impose for commission of a federal misdemeanor, and a penalty that sounds a distinctly discordant note in the midst of the fundamentally humane objectives served by relevant federal laws.[30]

30. Of course, the proposed federal legislation—which would be an even clearer indicator of appropriate judicial action than presently exists—does not have the force of law. Nevertheless, the pendency of such legislation underscores the dangers inherent in state regulation of resident illegal aliens which goes beyond federal regulation on that front. If permitted to do so, a state might take action, as Texas has done with § 21.031, which could thwart any future congressional amnesty program. President Carter, for example, has recommended adjustment of status in order to avoid "a permanent 'underclass' of millions of persons who have not been and cannot practicably be deported." Office of the White House Press Secretary, President's Message to the Congress on Undocumented Aliens at 5 (Aug. 4, 1977).

By virtue of its lack of rationality, section 21.031 of the Texas Education Code violates the equal protection clause of the Fourteenth amendment and hence is unconstitutional. Therefore, the defendants will be permanently enjoined from applying section 21.031 of the Texas Education Code and the policy adopted by the Board of Trustees of the Tyler I.S.D. on July 21, 1977, so as to deny free public education to any children in the Tyler I.S.D. solely on the basis of their status as undocumented Mexican aliens.

Should undocumented children currently residing in Texas be denied education, the seeds of

that "underclass" will already irretrievably have been sown.